## THE VIRGINIA and THE LOUISE.

### (District Court, D. Maryland. May 8, 1891.)

**1. COLLISION BETWEEN STEAMERS—SIGNALS—FAILURE TO REVERSE.**

A collision happened in the night-time at the junction of the Ft. McHenry and Brewerton channels of the Patapsco river between two side-wheel passenger steamers, the Virginia and the Louise. The Louise, the incoming steamer, at a proper distance signaled to the Virginia by two blasts that she desired to take the southerly side of the channel, being the side which was on her port. The signal was answered by a steam-tug, which was between her and the Virginia. Without getting any reply from the Virginia, the Louise put her helm to starboard, and continued, at her full speed of 11 miles an hour, until she was about a quarter of a mile from the Virginia, when she again gave a signal of two blasts. The Virginia being then over on the southerly edge of the channel with her wheel to starboard, and the channel being obstructed by a schooner, the Virginia was unable to avoid the Louise, and they collided just at the bend of the channel. *Held*, that the Louise was in fault (1) in putting her helm to starboard, and taking the side of the channel which was on her port, without getting an assenting signal from the Virginia; (2) also in not obeying the rule which required her, having the Virginia on her starboard side, to keep out of the Virginia's way; (3) also because, when the risk of collision was apparent, the Louise did not stop and reverse her engines, but merely slowed.

**2. SAME—RATE OF SPEED—MUTUAL FAULT.**

The Virginia, the outgoing steamer, heard the signal of two blasts given by the Louise, and when it was answered by the tug supposed it was intended for the tug. She continued her full speed of 14 miles an hour, and ported her helm to avoid the schooner, and went over to the southerly edge of the channel; but she did not make out the side lights of the Louise, nor did she signal herself until the Louise came out from behind the schooner, and signaled a second time when the steamers were not over a quarter of a mile apart. Then the Virginia blew danger signals, and reversed her engines, and did all she could to avoid the collision. *Held*, as to the Virginia, that, as she was nearing a bend of the channel obstructed by the schooner, and had not made out the side lights of the Louise, she was in fault in maintaining such a high rate of speed in a place of such danger, under such uncertainty with regard to the Louise's course, without having a distinct understanding by interchange of signals before the steamers had approached so near to each other. Experience has demonstrated that the strict observance of every precaution prescribed by statutory regulations and by good seamanship is necessary for the safe navigation of steamers at high speed in the channels of the Patapsco river. *Held*, that both steamers were in fault.

*(Syllabus by the Court.)*

In Admiralty. Libel for damages by collision between steamers.

*Thomas W. Hall* and *H. V. D. Johns*, for the Louise.

*John H. Thomas* and *George Lieper Thomas*, for the Virginia.

*Archibald Sterling*, *Thomas G. Hayes*, *Robert H. Smith*, and *Beverly W. Mister*, for petitioners.

MORRIS, District Judge. About 8 o'clock on the evening of July 28, 1890, the steamer Virginia and the steamer Louise, both side-wheel passenger steamers, came into collision in the Patapsco river, near Ft. Carroll, about six miles from Baltimore. The Virginia was on her regular trip from Baltimore to Norfolk, and received considerable damage from the breaking of her stem, which was twisted to starboard, but neither her passengers nor cargo were injured. The Louise was a large excursion steam-boat, returning to the city from Tolchester Beach, with 1,500 excursionists on board. She was cut into on her starboard side, about 30 feet from her stern, the bow of the Virginia penetrating through her

guards, and cutting her hull to the water's edge, doing her considerable injury, and with the lamentable result that 14 of her passengers lost their lives and a number were injured. The case is now heard upon the libels and petitions of the injured passengers of the Louise, and of the persons who, under the Maryland statute, are entitled to sue for the death of those who were killed, these libels and petitions alleging that both the steamers were in fault; and upon the cross-libels of the owners of the steamers, each alleging that the other was in fault for the collision. The collision took place at from 100 to 200 yards to westward and southward of the bend at the junction of the Ft. McHenry and Brewerton channels of the Patapsco river. These are deepened channels of the river, in which, near the place of collision, there is a depth of 27 feet for a width of 500 or 600 feet; but the natural depth of the river at that point, and for a considerable distance above and below, is navigable for steamers of the draft of the Virginia and the Louise for a distance of nearly half a mile on each side of the deepened channels. The course of the Ft. McHenry channel is N. W. ½ N., and of the Brewerton channel W. N. W. ½ N.; so that the difference in the courses is two points. As these channels are the most direct route for vessels approaching or leaving Baltimore, and are marked with buoys on the northern and eastern side, and range lights are maintained to guide vessels in them, they are commonly followed by all steamers, including those whose shallow draught does not require that they should keep in them. The testimony on behalf of the Louise shows that she left Tolchester Beach at 7 o'clock, to bring her passengers to Baltimore, and that when she was in the Brewerton channel, some distance below the bend, her pilot saw ahead of her a three-masted schooner, the Yale, proceeding under sail up the Brewerton channel in the same direction as the Louise, and that he saw the Virginia coming down the Ft. McHenry channel. He blew a signal of two blasts, intending to indicate to the Virginia that the Louise would starboard her wheel, and desired to take the southerly and westerly side of the channel, and to pass on the Virginia's starboard side. This signal was immediately answered with an assenting signal of two blasts, not by the Virginia, but by a steam-tug, which was just coming up to the schooner Yale to speak her, and which was outside the channel to the northward. The pilot of the Louise did not immediately repeat his signal, but, putting his helm a little to starboard, he proceeded on up the channel, getting a little more to the southerly side of it, until, when not far from the bend, he saw the Virginia's red light coming around the southerly side of the Yale. He then again blew two blasts to the Virginia, expecting, as he says, that the Virginia, after clearing the Yale, would starboard her wheel and change her course to straighten down the Brewerton channel, and would come in between the Yale and the Louise. This the master of the Virginia states he had never intended to do, and that, when he got the signals from the Louise, it was impossible for him to do it, as, when he had cleared the Yale, he was under a port helm, and had the Louise two points on his port bow, and his position was such that he had every reason to conclude that it was

impossible for him to break his sheer and change his course, and pass in between the Louise and the Yale. Up to the moment of the Louise giving her second signal, both steamers were under full speed, the Virginia making not less than 14 miles an hour, and the Louise not less than 12 miles an hour. Both the pilot and the master of the Louise claim that the Virginia did answer the Louise's second signal with an assenting signal of two blasts, and afterwards blew danger signals. The witnesses on behalf of the Virginia deny that she ever answered with assenting signals, and testify that she blew danger signals just as soon as the Louise blew the two blasts, and showed her green light on the southerly side of the Yale, and that she continued to blow repeated danger signals almost to the moment of collision.

Assuming, however, as is contended on behalf of the Louise, that the Virginia did answer with two blasts, and in a very short interval afterwards blew the danger signals, still, even if we take the testimony of the master and pilot of the Louise more favorably for her than the inconsistencies in the master's testimony and the conflicts between his statements and those of the pilot would warrant, I think there can be no doubt that the case made for the Louise condemns her. Taking the situation to be as those in charge of the Louise evidently considered it to be at the time they gave the first signals, they were then expecting, and based their actions upon the expectation, that both steamers would keep to the channels, and they recognized the fact that neither was to be expected to pursue any course independently of the course of the channels. The master and pilot of the Louise both say they expected that the Virginia, which was then in the Ft. McHenry channel, would change her course when she got to the Brewerton channel, and they evidently expected to pass her in one or other of the channels, or in the bend. Under these conditions, they were bound by article 21 of the international rules to keep the Louise to that side of the mid-channel which was to her starboard side. Furthermore, in passing in either of the channels, the steamers would be meeting end on, or nearly end on, so as to involve risk of collision, and the Louise would be bound to direct her course to the starboard, so as to pass on the port side of the Virginia. Also, by rule 1 of the pilot rules, they would be bound to pass port to port, and bound to signal with one blast of the whistle. These rules, applicable to the navigation of the Louise, those in charge of her, without any compelling reason except their own convenience, desired to reverse, and to take the side of the channel which was on their port side, and to have the Virginia pass them on their starboard side. Such a course, especially near the bend of a river channel, requires the most cautious seamanship; but they had the privilege of attempting it upon one simple, but absolutely essential, condition, which was that, at a sufficient distance apart, they first obtained the agreement of the Virginia by getting her assenting signals. That agreement they attempted to obtain at the distance at which they thought they ought to have it. Their signal was not answered by the Virginia, but was answered by another nearer steamer, and yet they kept on with a starboard wheel, just

as if they had obtained the agreement, and maintained their full speed of 11 miles an hour, approaching rapidly the schooner, which was an obstruction to both steamers; approaching the bend in the channel where they supposed both steamers would alter their courses, and where there is always greatest necessity for caution, and where, if both steamers kept to the southerly side of the channel, they must almost certainly collide.

It clearly appears from the case made for the Louise by the testimony of her master and pilot, that, without getting any agreement by interchange of signals, and without slackening speed, and while violating all the rules prescribed to avoid risk, and seeing all the time the red light of the Virginia open off their starboard bow, they kept on, trusting solely to an expectation that when the Virginia had reached the turn and had cleared the Yale she would starboard her wheel and change her course so as to pass the Louise on her starboard side. This was leaving all to chance in a situation which called for a distinct understanding with the approaching steamer, and the strictest observance of all the rules for safe navigation. If, on the other hand, it can be said, as was earnestly urged on behalf of the Louise, that, both being side-wheel steamers of shallow draught, they were not confined to the channels, and that they are therefore to be treated as vessels in wide navigable waters, then the Louise is equally in fault. She had the Virginia on her starboard side, and by article 16 the Louise was bound to keep out of the way of the Virginia. This she did not do, and did not intend to do, but those navigating her relied upon the expectation that the Virginia would keep out of her way by changing the Virginia's course to haul into the Brewerton channel. It is plain, also, that, after the Virginia ported to avoid the schooner, and the Louise starboarded upon giving her first signal, the steamers were in the fourth situation shown in the diagrams of the pilot rules illustrating the use of the side lights. The Louise was showing her green light, and was seeing the red light of the Virginia, and was bound to put her helm to port, and the Virginia was bound to continue her course.

It is obvious that the pilot of the Louise, without any indication from the Virginia, proceeded upon a theory that it was the intention of those navigating her when they had cleared the Yale to starboard her wheel, and go to the eastward; and upon this theory he kept on at full speed, without repeating his signal, until it was discovered that he had misapprehended the intention of those in charge of the Virginia. Nor did the master of the Louise, when he assumed full control, after the second signal of the Louise was given, and when he heard the danger signals of the Virginia, take proper steps to avoid the impending collision. He neither stopped and reversed his engines, as required by article 18, nor did he hard a-starboard his wheel, and go full speed ahead, either of which maneuvers might possibly have been successful; but he put his wheel somewhat to starboard, but not hard a-starboard, and merely slowed his engines. It does not seem to me that there is any view that can be taken of the navigation of the Louise which does not inculpate that steamer.

The case of the Virginia presents much greater difficulty. Unless the Virginia delayed too long, considering her high rate of speed and the

want of certainty as to the movements of the Louise, in taking the initiative and giving the proper passing signals prescribed by the pilot rules, I can find no other fault which can be imputed to her navigation.    She was on her proper side of the middle of the channel from the time she straightened down the Ft. McHenry channel, and, in avoiding the Yale, had got over to the southerly edge, and probably outside of it.· The Yale, being about the middle of the channel, and the Virginia on her proper side, in clearing the Yale the Virginia rightly ported and kept well away from her.    The Virginia was also justified in supposing that the first signal of the Louise was not intended for her, as it was immediately answered by the tug, which was much nearer to the Louise, and it was not repeated.    When the Virginia got the second signal from the Louise, whatever may have been the impression on the minds of the officers of the Louise, I think it is abundantly proved that the Virginia did not answer with an assenting signal of two blasts, but she at once blew danger signals, and at once rang to reverse full speed astern.    This was the proper thing to do, and is prescribed by article 18 and by rule 3 of the pilot rules.    This prompt reversing doubtless prevented the collision from being much more calamitous in its results, as the Virginia had nearly stopped her headway when the vessels came together.

It is urged on behalf of the Virginia that, as she was the privileged vessel, pursuing the course which, under the law, she was entitled to hold, she had a right to maintain her speed, relying upon the approaching vessel performing her duty, to keep out of her way, or, at any rate, to keep away from the Virginia's side of the channel.    But, between two steamers which are approaching each other, either head and head, or in an oblique direction, safety of navigation requires that there shall be no uncertainty as to how they propose to pass each other; and therefore the pilot rules peremptorily require that they shall interchange signals at the distance of half a mile apart, or, if they do not, that, when they get within half a mile of each other, they shall slow down until proper signals are interchanged and a definite understanding is arrived at.    It is quite true that, often in harbors and with small steam-vessels, the opportunity to interchange signals or the necessity for an understanding with each other does not arise until the vessels are nearer than half a mile, and it is also true that the estimation of distance is so difficult on the water that admiralty courts are careful not to hold navigators to an impossible accuracy as to distances, provided, having due regard to the speed of the vessel and the other circumstances of the case, the signal is given at a perfectly safe distance, and the rule is substantially complied with.    It is therefore necessary that the court should ascertain, as nearly as the testimony will disclose, what was the distance between the two steamers when the second signal was given by the Louise, and whether, considering their speed and the place where they were to pass and the circumstances attending their approach to each other, the Virginia was in fault in not taking the initiative, and signaling before the Louise.    The Louise was seen from the Virginia at least as soon as she gave her first signal.    It was not quite dark, all her saloon lights were seen, and she was

known to be the Louise, a large excursion steamer of considerable speed. It was known to those in charge of the Virginia that the Louise's course was up the Brewerton channel towards Baltimore. It was known to them that the two steamers would pass each other somewhere near the bend in the channel, and somewhere near the schooner Yale. It was known to them that the combined speed of the two steamers was not less than 25 miles an hour, approching each other at the rate of half a mile in less than a minute and a half. These facts, known to those in charge of the Virginia, presented to them, it seems to me, a case in which, if their speed of 14 miles an hour could be allowable, it could only be so if accompanied with the most careful attention to the movements of the other steamer, and an interchange of signals at such a distance apart that misunderstandings could be corrected.

In ascertaining the distances in this case, there is not only the usual difficulty that the direct testimony on the subject is only an uncertain estimate, but the additional difficulty that the officers of both steamers and the witnesses in their behalf are liable to be swayed by the fact that neither steamer can justify herself except by putting the distance at half a mile; so that both sets of witnesses are tempted to make the most favorable estimate of the distance. This influence is observable in some differences between the statements made just after the occurrence and those made at the hearing, when the importance of the distance was more fully appreciated. But among the facts quite accurately established by the testimony is the place of the collision, and the place where the schooner was at that time, and the witnesses pretty well agree in fixing the distance from each of the steamers to the schooner at the time the second signal was given. Capt. Bohannan, the master of the Virginia, testifies that he had just put his hand to the rope to give a signal of one blast to the Louise, when he heard the Louise's second signal of two blasts, and, seeing then that it was impossible for the Louise to pass him by going to his starboard, he without a moment's delay blew the danger signals and rang to stop and back full speed astern. He says that at that time the schooner Yale was off his port beam her jibboom pointed between the Virginia's paddle-box and stern. The lookout of the Virginia says the place of collision was off the Yale's port quarter, a little abaft her beam. The master of the Yale says the collision took place 300 to 400 yards, bearing S. E. by S. off from his port quarter, and would have been abeam of him if he had not luffed, throwing his schooner's head to the northward. He also says that, just before the danger signals were sounded, thinking the Virginia was getting rather close to him, he ported his wheel and luffed, in order to be safe, and be out of the Virginia's way, she being then within hailing distance. With regard to the Louise, the master of the Yale says: "When she got close up under my port quarter she blew two more whistles;" meaning her second signal. It also appears from the testimony of those on the Yale that, when the Virginia reversed her engines, the master of the Yale ordered the peaks of his sails to be dropped, and the schooner to be luffed still more, for fear he might run into the Virginia if she backed. Capt. Boon, of the tug Mamie, which was to the

eastward of the Yale, testifies that when the Louise blew her second signal she was under the Yale's port quarter, and that the collision took place right off the Yale's port bow. Rhuark, the pilot of the Louise, testifies that, when he blew the second signals, the Virginia's bow and her red light had opened clear of the Yale's stern; and Capt. Truitt, the master of the Louise, testifies that when the Louise blew her second signal the Yale was right on the Louise's broadside, abeam, and about 300 yards off. Several of the most observing witnesses from among the excursion passengers on the Louise confirm the nearness of the schooner. Oldfield, being questioned as to the distance of the Yale from the Virginia when the Virginia changed her course to the westward, and gave the danger signals, says: "We had got past the schooner, and the tug was then astern of us." Livingstone, another passenger of the Louise, testifies that they were passing the schooner just as he heard the Louise give the second signals.

It would appear, by a general concurrence of the witnesses from all the vessels, that the Yale, which was luffing and moving very slowly, was, just before the collision, at the very angle or bend of the two channels, and about in the middle of the channel; that both the Virginia and the Louise, although both well off to the westward of the Yale, had approached so near each other before the second signal was given by the Louise as that both appeared to be passing the Yale. Each steamer then saw the other around, either to the westward side or the stern, of the Yale, the Virginia discovering the green light of the Louise, and the Louise seeing the red light of the Virginia, coming out from under the stern of the Yale. It was at this moment that the Louise gave her second signal, and that the Virginia answered with the danger signals. Both were at once aware that there was imminent risk of collision, and both tried to avoid it; the Virginia by backing, and the Louise by continuing her sheer under a starboard helm, and somewhat slackening her speed. The reason why these maneuvers were not successful was that, considering the speed of the steamers, there was not distance enough between them. This, it seems to me, is convincing that the distance between must have been much less than half a mile, and much less than was safe for them to approach each other without an interchange of signals. They were both side-wheel steamers, of shallow draught, not difficult to handle. The master of the Louise says that when she is at full speed she can be stopped in from 600 to 900 feet. The master of the Virginia says she can be stopped and started back in four times her length, which would be about 1,000 feet. Half a mile is 2,640 feet. The engineer of the Virginia says he got the bells to stop and back full speed astern immediately upon hearing the danger signals; that the Virginia can be stopped with about five reversed revolutions of her wheels; and that he had got about two reversed revolutions before the collision. As soon as Capt. Bohannan heard the second signal of the Louise, he exclaimed that it was impossible for her to cross his course. If they were then half a mile apart, it is not easy to understand why he could not have stopped the Virginia before she had gone ahead a quar-

ter of a mile, or 1,320 feet. If, on the other hand, it can be true that when the danger was seen and the signals given the vessels were half a mile apart, then it is evident that the Virginia's speed of 14 miles an hour was dangerous for her to maintain, in the night-time, navigating the channel with a schooner ahead of her and a steamer coming up astern of the schooner, whose course had not been indicated to those on the Virginia by her side lights or her whistle.

There is no question but that there is a great difference between the culpability of the officers navigating the Virginia and those navigating the Louise. The latter were primarily in fault for creating the risk of collision, while those navigating the Virginia did everything to avoid it, and are only in fault for allowing the Louise to get as near as she did without taking the initiative, and giving the proper passing signal; apparently taking for granted that the Louise was coming up on her proper side of the channel, as they supposed the interchange of signals between her and the tug indicated that she would. It is certain, however, that, if the Virginia had signaled before the Louise came out from behind the Yale, the collision would have been avoided. Considering the well-known danger which attends navigating these channels, unless every precaution is taken to avoid misunderstandings, it is the duty of the court to rigidly enforce the regulations. It may be said of the pilot rules for interchange of signals between steamers when navigating these channels, as has been said of the rules governing vessels navigating in a fog, that they are not merely for the purpose of preventing collisions, but of preventing danger of collisions. *The Dordogne*, 10 Prob. Div. 10.

There is another point to which it is proper to advert. It is alleged in the Virginia's libel, and testified to by her master and pilot and lookout, that, although they saw the general saloon lights of the Louise when she gave her first signal, they never made out either of her side lights until her green light came out upon them from under the stern of the Yale. They suggest, as the possible reason for this, that they were too far off at first, and that afterwards the lights were hid by the Yale. But the Louise's side lights could have been seen, especially with the glasses, at two miles off; and, if they remained hid by the Yale for any considerable time that, of itself indicated that the Louise was starboarding, or, at least, it was a case of such uncertainty that it was a fault in the Virginia to keep on at full speed without signaling. Those in charge of the Virginia were looking at the Louise's lights across the interior angle formed by the two channels. She was astern of the Yale, and they say she appeared to them to be well on the starboard or northern side of the Yale's course, because, looking to the starboard of the Yale, they saw a long space between her and the Yale. But this was an unreliable inference. They were looking across the bend, and could not well determine how the Louise bore to the Yale; and the fact is that, if they had made out the Louise's side light after she blew her first signal, they would have seen her green light, and might have discovered that she was starboarding. I think, in fact, they were watching the Yale, and were relying on the Louise keeping to her proper side of the channel,

and did not give that attention to her lights which those maintaining such speed, under such circumstances, should have given. The Manitoba, 122 U. S. 97, 7 Sup. Ct. Rep. 1158, is an instructive case as to the high degree of diligence and watchfulness required by both approaching steam-vessels when there is uncertainty as to the intention of either. The case was one in which, as in this, the collision was mainly the fault of one of the steamers; but the other was also condemned solely because, having no certain indication of the intention of the approaching steamer, she allowed her to get so near as to produce the risk of collision before signaling or slackening speed. This court had occasion, in 1880, in the case of The Kate Irving, 2 Fed. Rep. 919, to call attention to the high degree of caution required to enable steam-vessels to safely pass each other in the Ft. McHenry, Brewerton, and Craighill channels; and the great number of lamentable collisions which have since occurred, resulting in loss of life and destruction of property, demonstrates that, with vessels approaching each other in these channels, risk of collision is liable to arise unexpectedly, at any moment, and that safety can only be secured by the strictest observance of every precaution prescribed by statute regulations and by good seamanship. I find that both the Louise and the Virginia are in fault.