## THE C. P. RAYMOND.[1]

### BROWN and others *v.* THE C. P. RAYMOND, etc.

*(District Court, S. D. New York. January 26, 1886.)*

1. COLLISION—TOWAGE—BARK AND RAILROAD FLOAT—HIGH WIND.
    The fact that a high wind prevailed at the time of a collision, which was the general cause of the accident, in thwarting the calculation of the pilots, *held* no legal justification for the accident, when it existed at the time the vessel started, and its natural effects were known and could have been foreseen.
2. SAME—TUG AND TOW—PILOT ON TOW IN CHARGE—JOINT NEGLIGENCE.
    A bark towed by a hawser, and having a pilot aboard, who had general control of the navigation of both tug and tow, *held* liable, in part, for a collision that occurred through the negligence of both pilots.
3. SAME—STATEMENT OF CASE.
    The tug R. started from Brooklyn to tow the bark M. to sea on a hawser, in a high wind. The bark had a pilot on board, who had the general control of the navigation of both. The tug, in her course, brought the bark to within 700 feet of the New York shore, near Pier 7, where lay a heavy railroad float lashed to the tug G., which had stopped nearly still in the water, to allow another tow to cross her bow and make Pier 7. The bark M. ran into the railroad float, which was on the former's starboard hand. On suit brought by the owners of the bark against the tug G. and the tug R., *held*, that the tug G. was not in fault, as she did all that was possible to her to avoid the collision from the time when she had any reason to suppose the bark would not keep out of the way; that the tug R. was in fault for going needlessly so near the New York shore, and for not avoiding the float, which was on her starboard hand, and for not using her full steam-power in a high wind; that the bark was liable for the negligence of the pilot in charge of her in not directing the other pilot to keep more away, and for not using the bark's own helm betimes for the same purpose, and that the damages and costs should be divided between the bark and the tug R.

In Admiralty.

*Jas. K. Hill, Wing & Shoudy*, for libelants.

*Owen & Gray*, for the George P. Garlick.

*Wilcox, Adams & Macklin*, for the C. P. Raymond.

BROWN, J. The libel in this cause was filed by the owner of the bark Margaret Mitchell, to recover $20,000 damages alleged to have been sustained by the bark and her cargo, between 9 and 10 o'clock A. M., on the tenth day of January, 1885, through a collision on the

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

East river with a float in tow of the steam-tug George L. Garlick. The bark, of 650 tons, was proceeding out to sea in tow of the tug C. P. Raymond, on a hawser of from 25 to 30 fathoms. The tide was ebb, and the wind very high from the north-west. The bark had been lying at Pierrepont's stores, Brooklyn. She was hauled out stern first; her head swung up river, and was pulled around through the northward until she headed down and out of the East river, through the main ship channel. During this time, two tows were coming down the East river; one, the steam-tug Lockhart, with four barges in tow upon a hawser about 50 feet long, in three tiers, making the tow, including the tug, about 575 feet long, and bound for Pier 7, East river. A little astern of this tow, and a little nearer to the New York shore, was the steam-tug Garlick, with a railroad car float lashed upon her port side 210 feet long, projecting much ahead of the tug, bound from Williamsburg to Jersey City. The float had two railroad tracks on it with six cars, each 29 feet long, on the port track, and five cars on the starboard track. The Lockhart, when nearly abreast of Pier 8, gave a signal of two whistles to the Garlick, indicating that she desired to cross the latter's bow, to which the Garlick immediately replied with two; and thereupon the Lockhart ported her helm, and ran in to the New York shore, rounding so as to head up river along-side of Pier 7. The tide carried her tow gradually downwards, but the high wind kept it off and out in the river longer than usual. The Garlick, to keep clear of the Lockhart and her tow, which were passing across her bows, first slowed, and then stopped, and backed her engine full speed. In the mean time the Raymond and the bark were gradually coming nearer to the western shore of the river. As they moved down and across, and while the Garlick was backing, the starboard bow of the bark came in contact with the float, striking the forward part of the third car, at the point where the bark's anchor hung overboard, with its flukes beneath the water. The blow was sufficient to cause the anchor to crush through the bark's bow, through which she took in water, damaging the cargo. Some of the stays about the bowsprit were also carried away.

The general cause of this collision was undoubtedly the very high wind that prevailed. This affected considerably the movements of all the vessels, and, to some extent, evidently, thwarted the calculations of the pilots of the Raymond and the bark. But as this wind existed at the time they started, and its natural effects were known, and could have been foreseen, this cannot suffice as a legal justification, or absolve the parties from legal fault.

It is of importance to determine approximately the place of the collision in the river. The witnesses vary all the way from Pier 8 to Pier 3, and from mid-river to within 600 feet of the New York shore. The collision was viewed by witnesses apparently disinterested, some of whom were astern and some ahead of the Garlick, on the river; and by one from the Gracie, at the end of Pier 10. The pilot of the

Lockhart, though he did not observe the collision itself, when he got up along-side of Pier 7, saw the boats in contact, as he says, nearly abeam. The pilot of the Gracie, at the head of Pier 10, saw the collision in range of the clock on the eastern side of Governor's island, and to him the collision appeared to be off Pier 3. The range fixed by this witness is important. Though that was a little before the collision, the Garlick could not afterwards have gone much, if any, out in the river, though her wheel was starboarded, because she was backing. This witness could not judge of the distance down river. That is fixed much better by the pilot of the Lockhart, and by the pilots on the ferry-boats crossing below, and by other witnesses whose testimony together satisfies me that the collision was not below Pier 6. This, together with the range given by the pilot of the Gracie, proves conclusively that the collision was less than 700 feet from the New York shore,—not a quarter of the distance across the river at that point. This is confirmed, also, by the natural probabilities of the case. The Lockhart passed under the Brooklyn bridge at about its center, i. e., 800 feet from the shore. She was bound for Pier 7, and would naturally keep along at about the same distance from the New York shore until she rounded to. The Garlick was estimated about 200 feet nearer the shore than the Lockhart. They were somewhat in the lee of the very high wind from the north-west, and there was strong reason for their not going unnecessarily further out in the stream.

The place of the collision being thus approximately fixed, the bark and the Raymond must be found in fault (1) for going without reason so near to the New York shore, and in a space set apart by law for the accommodation of tugs and tows, when that space was already incumbered by the presence of tows, and when all the rest of the river was clear; (2) having these tugs and tows upon the starboard hand, the Raymond and the bark were bound to keep out of their way, and to take timely means for doing so.

On the part of the Raymond and the bark there was some evidence to the effect that they were ahead of the Garlick, and that the Garlick in reality ran into the bark. The witnesses for the Garlick contradict this; and one circumstance, which there is no reason to discredit, clearly proves them correct. When the bow of the bark collided with the car upon the float, the whole line of six cars, through the force of the blow, was carried forward several feet upon that track, the lashings upon the cleats slipping. The cars upon the other track did not move. This proves that the bark had a considerable forward motion as compared with the Garlick, and that it was therefore the bark that ran into the Garlick.

2. I find no fault attributable to the Garlick. She first stopped and backed to allow the Lockhart to round to with her tow ahead of her. At that time the bark was some little distance off her port quarter coming down and across the river. The Garlick had no reason to suppose that the bark would not keep out of the way, as it

was her legal duty to do. The Garlick, when she had backed sufficiently to avoid the Lockhart's tow, stopped backing. Afterwards, as soon as it became apparent that there was doubt whether the bark was going to keep out of the way, she backed again, and got some 80 or 90 revolutions astern before the collision. In doing so her bows swung naturally a little to port; but, clearly, her maneuver, as a whole, did nothing to thwart the tug and the bark in keeping out of her way. The bark, as above stated, kept on and ran into the Garlick when the latter must have been nearly still in the water. The latter did all she could reasonably do, so far as I can perceive, to avoid the collision from the time when any danger of it became manifest. She must therefore be held discharged.

3. The evidence shows that the pilot taken on board the bark had the general control of the navigation of both, although the immediate movements of the tug were directed by her own pilot. The latter was, however, bound to observe any directions that the pilot on board the bark might choose to give. None were given by him in this case. The bark must therefore be held liable, because she did not keep out of the way of the Garlick; and because she is answerable for the neglect of the pilot on board of her, who had the general control of the navigation, and who ought to have exercised his authority to keep out of the way. *Sturgis* v. *Boyer*, 24 How. 110. The evidence shows, also, that the bark made no such diligent use of her own helm to aid the tug as she might and ought to have done in order to avoid the Garlick; but put it to starboard at the last moment only,—too late to be of any use. The Raymond must also be held in fault, because her pilot, acting under his own judgment, and practically and in fact directing the navigation of both vessels, did not sufficiently keep away from the Garlick, and from the Lockhart's tow, as he was also bound to do, and as it was easily in his power to do, all the rest of the channel being free. In addition to this, it also appears that the Raymond, though the wind was high, and all her power was needed in the service of the bark, used much less than her full steam-power, and thereby had the tow under less control than she might have had.

The libel should be dismissed, as respects the Garlick, with costs; and as between the tug and the bark the damages and costs must be divided.