CHRISTIE & LOWE et al. v. FANE S. S. CO.

(Circuit Court of Appeals, Fifth Circuit. February 11, 1908.)

No. 1,710.

1. COLLISION—VESSEL AT FAULT.

A tug and tow passing down the Mississippi river, near the New Orleans side, because of certain "boils" and cross-currents in the river, came into collision with a vessel safely moored at a wharf, one of the barges in the tow striking the vessel at almost right angles. The captain of the tug was an experienced navigator, and the tug itself was powerful and amply able to handle her tow. The fact that powerful eddies and cross-currents and "boils" were likely to occur at the point in question was well known to every navigator in the port, and in order to avoid them experienced pilots were in the habit of beginning to make a turn much farther up the river than the captain of the tug did on the morning in question, he, being desirous to take advantage of the down current in midstream as long as possible, waited until it was too late to make a turn with certainty of safety, notwithstanding the "boils," cross-currents, etc. *Held*, that the collision was not the result of inevitable accident from unforeseen conditions of navigation, but of the negligent navigation of the tug.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 19.]

2. SAME—DAMAGES—DOUBLE CHARGE.

Where, in a libel for collision, the injured vessel was under charter at a fixed rate, requiring her to pay and subsist the officers and crew a decree allowing damages for loss of charter money pending repairs, and in addition an amount for wages of officers and crew, and for cost of subsistence of the crew during the same time, was objectionable as a double charge for the same items of damage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 286.]

3. COSTS—ERRORS IN DECREE—CORRECTION.

Where a mistake in a decree was not called to the attention of the trial court nor assigned as error on appeal, its correction would not affect either the costs at the trial or on appeal.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

Chas. S. Rice and R. B. Montgomery, for appellants.

J. D. Rouse, Wm. Grant, and W. B. Grant, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PER CURIAM. This is a suit in admiralty to recover damages growing out of a collision. As we find the evidence, the case was

correctly ruled and decided in the District Court. It appears, however, that in framing the decree an error was made resulting in a double charge for certain items of damage. While the injured vessel Bratten was under charter at a fixed rate, she was, under the contract, required to pay and subsist the officers and crew. The decree allows $991.46 damages for loss of charter money pending repairs, and also (item No. 11) $269.46 wages of officers and crew, and (item No. 12) $84 cost of subsistence of crew during the same time. These two last-mentioned items it is agreed should not have been included in the decree. The mistake was not called to the attention of the lower court nor is it particularly assigned as error on this appeal, therefore it ought not to affect the costs either here or in the District Court.

The decree of the District Court is amended by striking out items of damages Nos. 11 and 12 and reducing the total amount of recovery from $14,336.86 to $13,983.40, and, as thus amended, the same is in all respects affirmed.

NOTE.—The following is the opinion of Saunders, District Judge, in the court below:

SAUNDERS, District Judge. The libelant in this case claims that its ship, the Bratten, was moored safely and properly at the wharf in New Orleans, on the morning of May 12, 1904, and that while so moored the said steamship was run into by a tow of barges which was being brought down the river by the steam tug R. C. Viet. The result of the collision was that a large hole was made in the side of the steamship Bratten, and she was broken from her moorings and set adrift in the river in a helpless condition. She was rescued by some steam tugs, who came to her assistance. These tugs demanded and sued for salvage, and recovered a judgment for $6,000 and costs. Expenses were incurred in repairing the Bratten, and she was put to considerable expense for the time she was delayed and for loss under her charter party. The answer admits the collision, but claims that it was due to inevitable accident. It is alleged that the steam tug Viet was properly equipped, had sufficient power to handle the tow; that its machinery was in good order, and that she was in charge of a competent and experienced master; that she was "tight, staunch, and strong, fully equipped with proper machinery, and apparatus, all in good order, for the work in which she was engaged; that she was one of the most powerful tugs used in and about the harbor of New Orleans." But, the answer avers, she was prevented from keeping her course as intended, "by the sudden, unexpected and unforeseeable currents, eddies, and boils in the river added to the then powerful current, adjacent to the point and extending and sweeping the said steam tug and her tow into the bend near the foot of which the steamship Bratten was lying, and in spite of the efforts of those on board the Viet, and not through any fault, omission, or neglect or inattention, or want of proper care or skill on the part of said tug, her master or crew; but that every care, skill, and duty devolving upon them, in the premises, was exercised to the fullest extent, and that no liability was, in the belief of respondents, incurred or devolves upon them" (the claimants).

The evidence proves the allegation of the answer as to the equipment, machinery, master, and crew of the Viet. It is shown that the master enjoys a high reputation for skill and care in his profession. It is further shown that he has had more experience, probably, than any pilot in the port of New Orleans, in handling tows up and down the river, and at the particular point where this accident occurred. The tug Viet is the second most powerful tug in the city of New Orleans. It is not proved that the barges which were in tow of the Viet that morning were too heavy for the tug ordinarily to handle. Indeed, the tow was of much less weight than tows which the same tug had handled successfully a few days before.

The evidence shows that it is a well-known fact that the point at which the collision occurred is more dangerous to navigate than most of the other points in the port of New Orleans. There is an eddy running up stream on the Algiers side of the river. There is a bend in the river which necessitates a sharp turn at that point. It is also proven, beyond any controversy, that at this point of the river particularly there frequently occur what the river men call "boils"; that is, eruptions of large volumes of water which are projected apparently from the depths of the river. No one seems to know what causes these boils. They probably result from the meeting of conflicting and opposite currents. When a boil occurs, if it emerges near the side of the bow of a vessel, it is apt to throw the vessel entirely out of its course. All these facts have been abundantly proven.

Capt. Strand claims that on the morning when the collision occurred this boat was pursuing a proper course, and that a boil suddenly occurred near the bow of his tug which threw it and the barges towards the New Orleans side. Before he could recover his course, another boil emerged, throwing the tug and barges again towards the New Orleans shore. The captain pursued his course, doing his best to throw the tug and barges from the New Orleans shore, so as to avoid collision with the vessels moored at the wharf on the New Orleans side. When he found that a collision was inevitable, he then reversed his engines and backed with all his power so as to lessen the force of the collision. But he testifies that his helm was hard aport and that it continued hard aport when he attempted to back the tug. The result necessarily was that the course of the tow was turned in, instead of parallel to the vessels at the wharf, and that when the collision occurred it was very much as if the barge which struck the Bratten was driven against that vessel for the purpose of ramming it. If the helm had been reversed, the direction of the tug and barges might then have been parallel to the Bratten, and not at right angles to it. This seems to me to have been a mistake on the part of the captain of the Viet, which resulted disastrously to the Bratten. Apart from this, however, I think that the evidence shows that the Viet was in fault in not attempting to make the turn sooner than she did. The evidence shows that the captain of the Viet did not turn in towards the Algiers side of the river until he had reached Conti street, three squares below Canal street, and the preponderance of the evidence convinces me that the turn should have been begun several blocks higher at least. One of the witnesses, a very experienced river pilot, says that in high water he always began to make the turn three or four blocks above Canal street. Others say they began to make the turn at Canal street. On this occasion the Viet did not begin the turn until she was opposite Conti street, and was going then at full speed. The reason why the Viet did not begin to make the turn sooner is very obvious. The river was high, and the eddy on the Algiers side going up the river was strong. If the tug and barges had gotten into this eddy on the Algiers side, while that course would have been far safer for the shipping on the New Orleans side of the river, it would have been more difficult for the tug and barges. The captain of the Viet naturally wished to take advantage of the down current in midstream as long as possible, and he accordingly kept in midstream until it was too late to make the turn with a certainty of safety. While it is true that he could not have foreseen the particular boils, eddies, and currents which he met after he began to make the turn, yet the testimony of all the witnesses show that boils and eddies occur at that point with great violence, and that every navigator in this port expects to meet them there. It was incumbent, therefore, on the captain of the Viet, in view of the known possibility of meeting boils, eddies, and currents which would deflect him from his intended course, to make the turn in time to have his tow so far on the west side of the river, that even if he should meet such boils and eddies and be deflected from his course, he could still regain it before being driven into the wharves on the New Orleans side.

It is clear to me that the captain of the Viet, in order to take advantage of the midstream current, and in order to keep out of the eddy or current on the Algiers side, which would have imposed additional labor upon his

own operations, took a risk for the vessels on the New Orleans side of the river that he should not have taken. The fact that no well-authenticated accident has ever occurred at this point convinces me that if the captain had gone sooner and further to the west, and had made proper allowance for deflecting boils and currents, this accident would not have happened. The evidence tending to show that he took a proper course has little or no weight with me, as one of the witnesses was not in a position to see accurately the course which was actually taken, and the other witness so manifestly exaggerates that I can attach little importance to his evidence. The occurrence of this accident, whereby a vessel safely and properly moored in a harbor was rammed by a tow in motion, is prima facie evidence of some negligence on the part of the tow. The evidence is far from convincing me that if proper care had been taken by the master of the Viet the accident would not have occurred; still less does the evidence show that the accident was the result of any inevitable accident. It was produced by currents, eddies, and boils, the possible and probable occurrence of which the master of the Viet was as well aware of as any navigator in the port of New Orleans, and for the occurrence of which he should have made a safe allowance in taking his course.

There will accordingly be judgment for the libelant, as prayed for.