## THE MERIDA.

(Circuit Court of Appeals, Second Circuit. December 9, 1913.)

### No. 49.

COLLISION (§ 95*)—STEAMER AND TUG WITH TOW—MUTUAL FAULTS.

 A decree affirmed which held a steamer and tug both in fault for a collision between the steamer and a scow without steering apparatus in tow of the tug meeting in the narrow channel between a harbor breakwater and another submerged breakwater in course of construction; the steamer being in fault for not giving the tug and tow more room, and the tug for suddenly crossing the bows of the steamer in an effort to prevent the scow from striking the submerged breakwater.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

 With or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeal from the District Court of the United States for the Western District of New York.

Suit in admiralty for collision by the Buffalo Dredging Company, as owner of the Scow No. 12, against the steamer Merida; the Gilchrist Transportation Company, claimant. Decree against respondent for half damages, and claimant appeals. Affirmed.

Clinton & Clinton, of Buffalo, N. Y. (George Clinton, Jr., of Buffalo, N. Y., of counsel), for appellant.

Brown, Ely & Richards, of Buffalo, N. Y. (J. B. Richards, of Buffalo, N. Y., of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. This is an appeal from a decree holding the Merida and the tug McNaughton both at fault for a collision between the steamer and scow No. 12 in tow of the McNaughton which resulted in the sinking of the scow.

The southern entrance to Buffalo Harbor is a passage 600 feet wide between Bottle Light, at the southerly end of a breakwater running about northwest by north and southeast by south and Stony Point Light, at the northerly end of a breakwater running about northwest and southeast. At the time of the collision to be presently considered, a breakwater was in course of construction, but still covered with water from three to eight feet deep running about a thousand feet west northwest from Stony Point Light to within fifty feet of a red gas buoy. These structures made a channel of deep water 1,000 feet long and some 900 feet wide between the gas buoy and the northerly break-

water, gradually diminishing to 600 feet at the gap between Bottle Light and Stony Point Light, which is the entrance to the harbor.

July 8, 1907, the tug McNaughton, towing a loaded dump scow drawing 10½ feet of water, 120 feet long and 32 feet beam, with square ends, by a line 200 feet long fixed on the starboard corner of the bow, rounded Bottle Light to go out through this channel into the lake. The scow was without any steering apparatus. Just ahead of this tow was the tug Tam O'Shanter, towing a similar scow on a hawser fixed on the port corner. The Tam O'Shanter blew a signal of two whistles to the steamer Merida which was coming down outside of the northerly breakwater, bound for the south entrance and about a half a mile away from it. The Merida answered with two. The McNaughton followed with a blast of two whistles as she rounded Stony Point Light, to the Merida, which were also answered with two. The Merida proceeded slowly but without starboarding and met the first dump scow just as she was rounding the red buoy into the lake. Thereupon the McNaughton blew a signal of three whistles which was, by the local understanding, a signal to the Merida to check her speed which was answered and conformed to. At about this time the proofs show that the scow was sheering toward the submerged breakwater. Several of the witnesses say that this was caused by an eddy current around the end of it. The testimony as to this current, its cause, force and direction, is extremely vague and unsatisfactory. The master of the Tam O'Shanter says the current was very slight. However, it does appear that because of a sheer to port, the tug blew an alarm and went suddenly off to starboard right across the steamer's bow, with the intention of pulling the scow away from the submerged breakwater, but in so doing brought her into collision with the steamer. The district judge has found the place of collision to have been less than 225 feet outside of the breakwater.

The rule which requires a vessel navigating a narrow channel to keep on the side of midchannel which lies on her own starboard side is statutory. It is not contained in the act of February 8, 1895, which regulates navigation on the Great Lakes. When the signal of two whistles was exchanged the Merida and the McNaughton were on crossing courses, but each knew that this was but temporary, and the effect of the exchange was an agreement that they should meet and pass each other starboard to starboard. The Merida was not bound to enter on the range for midchannel nor to keep north of it. All she was bound to do was to give the tug and tow enough room to pass safely between her and the submerged breakwater. Her master, however, was entirely unacquainted with the channel and did not know of the existence of the submerged obstruction. If he had, it is quite evident he would have given the tug and tow more room. Certainly he would and should have been active in doing so when he saw that the scow was sheering to port toward a dangerous submerged obstruction.

The practice of towing a rudderless scow with square ends by a line fixed to one corner of the bow is new to us. It is said to be followed for the purpose of keeping the scow clear of the tug's wash, the scow under such circumstances towing steadily on one side or the other of

the tug, according as the line is fixed to the port or starboard corner. Several of the witnesses say that the effect of towing the scow from her port corner would be to keep her on the starboard side of the tug. We think this cannot be so. The resistance of the water against the square bow would tend to make the scow rotate to starboard around the point where the line was fast until that tendency was counteracted by the resistance of the water against the starboard side. Then the scow would arrive at a condition of equilibrium and tow steadily, heading to port, but tailing to starboard. The sudden sheer of the tug across the steamer's bow when so close aboard was negligent navigation as the master of the tug himself admits. If the eddy current to which he attributes' the sheer was a thing to be expected under the circumstances, as he seems to say, he should not have postponed his porting and his alarm whistle until danger was so imminent.

The decree is affirmed, with interest; costs of this court to be divided.