### THE MAY McGUIRL.

#### (District Court, E. D. New York. June 29, 1914.)

1. TOWAGE (§ 11*)—RISKS ASSUMED BY TUG—WEATHER CONDITIONS.

A tug, which starts with a tow when a strong wind is blowing, assumes the risk of injury to her tow, or to other vessels, from weather conditions which are reasonably to be expected under such circumstances.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11-23; Dec. Dig. § 11.*]

2. COLLISION (§ 71*)—FAULT—LIABILITY OF TUG—INJURY TO OTHER VESSELS.

A tug started with a tow at night in a strong wind, using two hawsers, one of which parted after going a short distance. The tug was not in fault for attempting the voyage, nor in the use of the hawser, which was apparently sufficient. After it broke, the captain, in the exercise of his best judgment, chose what appeared from the evidence to have been a proper course by allowing his tow to fall back into a slip, where in the darkness in some manner it struck and injured another vessel lying there. Held, that the handling of the tug in this new undertaking was the proximate cause of the injury, the risk of which the captain assumed in attempting the maneuver, and that she was liable therefor.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101. Dec. Dig. § 71.*]

In Admiralty. Suit by the Lehigh Valley Transportation Company against the steam tug May McGuirl. Decree for libelant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, advocate), for libelant.

Alexander & Ash, of New York City, for claimant.

CHATFIELD, District Judge. At the trial of this case upon March 13, 1914, at the close of the testimony, the following findings of fact were stated, with a reservation of determination as to the proximate cause of the accident and the legal responsibility therefor:

"The tug having gone to Fifty-Second street with the barge Fort Hamilton alongside, and failing to get another barge at that point, took the Fort Hamilton in tow with two hawsers of 20 fathoms each to proceed to the North River. The wind had been strong enough before leaving Fifty-Second street to put upon the captain the obligation of care in undertaking the trip, and also in considering the condition of his equipment. It is shown that the wind increased greatly as the tug went out of the slip and rounded Pier 1 to start up the bay. When off Pier 2 the starboard hawser parted, and the barge was immediately carried against the end of the pier. It is shown that the port hawser was a comparatively new 7-inch line and that the hawser that parted was a 5½-inch line that had had some use, but there is no evidence that it was not fit for the purpose, except that furnished by the parting, and this would seem to have been caused rather by the strength of the wind than through any defect in the line.

"The captain of the tug attempted to let the barge back in the slip south of Pier 2 until she could be moored to some boat alongside, and, according to the testimony of the master of the Fort Hamilton, she came in contact with no other boat until, having gone to the stern and having returned to the port bow and prepared a line, he concluded that he could moor the barge to a Mallory lighter which was lying alongside a derrick boat on the north of Pier 2. He succeeded in getting a line to the Mallory lighter, and also a stern line out, and then threw off his hawser. The tug moved over to the side of the pier, and the Fort Hamilton was drawn in closer at the stern towards the bow of the Mallory lighter, where it remained during the night. The captain of the Fort Hamilton says that, at about the time he passed the line to the Mallory lighter, the stern starboard corner struck the Lehighton, which was lying outside of another boat on the south side of Pier 2. The captain of the Lehighton places the point of contact on the starboard side of the Lehighton just forward of the stern corner. It appears that, after holding some conversation with the captain of the tug about loosening his lines and moving further up the pier, he found about 18 inches space between his bow and the stern of the Standard Oil boat. He could shove his boat only that distance, but later the bow of the Lehighton was chafed or injured somewhat by contact with the Standard Oil boat.

"It would appear that the Fort Hamilton did not come in contact again with the Lehighton after the first blow, and the subsequent injury was probably the result of the waves, if the Lehighton had been brought too close to the Standard Oil boat. The place of the injury on the side of the Lehighton would seem to be more accurately fixed by her captain than by the impression of the captain of the Fort Hamilton as to where he struck her, inasmuch as he was at the other end of the Fort Hamilton at the time. Those questions of fact are immaterial, because the main facts are not in dispute.

"Mr. Jones: I think that damage on the bow of the Lehighton was insignificant, if any at all.

"Mr. Alexander: The lines between the Fort Hamilton and the Mallory boat were made fast before the hawser was cast off.

"The Court: This case presents the unusual situation of an accident which, from the standpoint of the libelant, is entirely within the doctrine of res ipsa loquitur. The libelant was where he had a right to be, and did nothing whatever which in any way led up to or induced the accident. The burden of explaining the injury and the circumstances from which the injury arose was thrown upon the claimant. So far as the parting of the hawser is con-

cerned, there is no evidence to indicate negligence, and the severity of the storm was not such as to make the tug at fault for attempting the voyage. Until the Fort Hamilton struck the end of the pier, the situation would seem to be that produced by inevitable accident. And if the question were that of injury to the pier, or to the Fort Hamilton, then the doctrine of inevitable accident would directly apply. But from that time on the captain of the McGuirl had to choose between allowing his barge to be wrecked and causing other damage. In attempting to pursue the best course possible, he chose that which, according to the evidence and from the facts, was the proper thing to do, namely, to moor his barge inside of the slip, and he thereby undertook the risk involved in making the landing, in preference to the risk which the choice of another course would have involved.

"I think, therefore, that the question which is presented is one of fact, as to what was the proximate cause of the accident, and it is evident that the proximate cause was the action of the captain in undertaking to let the boat drop back in the slip in his then condition, rather than the breaking of the hawser.

"The question in the case, then, is whether the libelant can recover for an injury of the nature shown in a case where the doctrine of res ipsa loquitur applies, when that injury was inflicted by some one who, in a time of danger, chooses, with proper exercise of judgment, the lesser danger to avoid a greater.

"And the second question is whether, under such circumstances, he is responsible for the injury inflicted, and which he could not but know would be inflicted in the ordinary course of events.

"Mr. Jones: So far as I can recall, the weather when they left Fifty-Second street was the same; it was blowing a heavy gale.

"The Court: They were responsible for going out. Briefs to be submitted on the question outlined."

Briefs have now been submitted, and the matter will be determined as follows:

[1] Counsel for libelant have urged further the charge of fault on the part of the tug for undertaking the voyage from Fifty-Second street to the Hudson river against such a wind as was prevailing at the time. The pier at Fifty-Second street is very close to Piers 1 and 2 of the Bush's Docks, and the time elapsing after the boat left the pier and up to the point of accident must have been so short that the weather conditions generally were observable when the voyage was undertaken. No squall or hurricane has been shown of such magnitude and suddenness as to relieve the liability of the tug from the risks to be expected in a strong wind. Sudden strains and puffs of wind, or from changes of direction on the part of the tug, were to be anticipated. The tug was therefore liable for any risk which it should have considered, but did not. The Merida, 210 Fed. 440, 127 C. C. A. 172; The C. P. Raymond (D. C.) 26 Fed. 281; The Young America (D. C.) 25 Fed. 207; Christie & Lowe v. Fane S. S. Co., 159 Fed. 648, 86 C. C. A. 516; The Bordentown (D. C.) 40 Fed. 682; The Victoria (D. C.) 79 Fed. 122; The Nannie Lamberton (D. C.) 79 Fed. 121.

The finding of fact by the court, on the trial, that the tug was not at fault in attempting the voyage, and was not negligent in inspecting or using the substantially new hawsers with which the towing was done, disposes of this matter.

[2] The libel, however, charges that the tug was at fault (1) in failing to keep the tow clear of the barge; (2) in attempting to moor the tow in a dangerous position too near the barge; (3) in failing to take any measures to protect the canal boat after its danger was realized;

and (4) a general charge of incompetency on the part of those handling the tug.

The case on the charges of fault presents a most. unusual point of law. As was indicated in the statement of facts, the doctrine of res ipsa loquitur is presented in a singularly simple manner by the facts that a boat lying at anchor was injured through the movement of another boat in tow, and that this injury was inflicted in a place where the mere infliction of injury from a moving boat would furnish a presumption of negligence, with the conditions of weather and darkness under which the maneuver was being conducted by the tug.

As has been pointed out by the claimant, however, the doctrine of res ipsa loquitur creates only a presumption of negligence. In this. case the evidence has set forth all the facts, and the presumption gives way to actual determination as to the legal liability of the claimant.

The claimant has presented a long list of authorities, beginning with the celebrated Squib Case (Scott v. Shepard, 2 Wm. Blackstone, 892), and has prefaced its memorandum by the statement that no case exactly similar to the present has been found by search of the authorities. In the Squib Case, the responsibility for negligence was carried back from man to man, who acted under the doctrine of self-preservation or involuntary effort to avoid injury, until liability was placed alone upon the man who carelessly lighted and threw the squib in a place where it was likely to cause injury. See, also, Insurance Co. v. Tweed, 74 U. S. (7 Wall.) 44, 19 L. Ed. 65; Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Scheffer v. Railroad Co., 105 U. S. 249, 26 L. Ed. 1070.

In Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395, the limitation or further application of the doctrine of "proximate cause" is stated in fixing the liability for the accident. The court says:

"The proximate cause, as we have seen, is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. In Milwaukee & St. Paul Railway Co. v. Kellogg, 94 U. S. 469 [24 L. Ed. 256] we said, in considering what is the proximate and what the remote cause of an injury: 'The inquiry must always be whether there was any intermediate cause, disconnected from the primary fault, and self-operating, which produced the injury.' In the present case, the burning of the City Hall and the spread of the fire afterwards was not a new and independent cause of loss. On the contrary, it was an incident, a necessary incident and consequence, of the hostile rebel attack on the town—a military necessity caused by the attack. It was one of a continuous chain of events brought into being by the usurped military power—events so linked together as to form one continuous whole. The case is, therefore, clearly within the doctrine asserted by Emerigon, and held in Butler v. Wildman, and in the other cases we have cited. Hence it must be concluded that the fire which destroyed the plaintiffs' property took place by means of an invasion, or military or usurped power, and that it was excepted from the risk undertaken by the insurers."

This is cited with approval in The G. R. Booth, 171 U. S. 450, 19 Sup..Ct. 9, 43 L. Ed. 234. In Nield v. London & Northwestern Ry. Co., L. R. 10 Ex. 4, and in The John Perkins, Fed. Cas. No. 7,360, it was held that attempts to prevent injury to one's own property or person were not themselves negligence, and that the proximate cause, as in

the Squib Case, was the original action or circumstances making protection necessary.

In The John Perkins, supra, the damage complained of was the loss of a cable and anchor, which had to be abandoned in order to save the vessel from a drifting vessel, which had itself suffered an accident, apparently without fault on its own part.

But all these cases emphasize the differences of fact presented in the case at bar. Here an accident occurred which in effect put the tug and the barge in peril. The tug, at the risk of parting the remaining hawser, and of losing its barge, or being cast ashore itself, could have endeavored to proceed against the storm, or to repair the damage, or work out of the situation in some other way. If unable to do anything, the tug or barge might actually have gone adrift. But this did not occur. A new voyage—that is, a maneuver which the tug thought would allow her to safely land her barge and seek protection—was undertaken, namely, to take the boat through the Gap into the Erie Basin. The tugboat captain was not merely avoiding accident, or acting under the stress of circumstances, from which accident inevitably resulted. He had the opportunity to determine what was the best thing to do. He chose to undertake a new and smaller risk of property loss, rather than to face the greater one which existed outside of the Gap. It is as if the driver of an automobile or team, having suffered some unavoidable accident, and realizing that the team or machine would be damaged, chose rather to smash into a fence, and then should object to restoring the fence, after thereby saving himself great loss.

The case is not that of a fire engine suddenly confronted with the emergency of killing some one or unavoidably destroying property of others, and avoiding the great injury by the necessary infliction of smaller damage. It must be held that the captain of the tugboat, from proper motives, had the opportunity and did choose to run the risk of whatever injury he might inflict in attempting to save his boat, by the trip into the Gap, rather than by running the risk of losing the boat by proceeding to some other point.

The proximate cause, therefore, of this accident, was the handling of the boat by the captain of the tug, in an attempt to take it into the Gap in the dark, and under the circumstances shown. There is nothing to indicate that the captain could not have raised some kind of an alarm, or ascertained the positions of the vessels near which, or alongside of which, he was going to moor the barge. The storm and his danger were not sufficient to make it impossible, inside of the Gap, for him to use precautions. On the contrary, he seems to have assumed that he could allow the boat to be dropped back into the Gap on one hawser, and to bump along against the boats which he knew would be lying there, until she happened upon a position where she could be moored. This was negligence sufficient to impose upon the tug responsibility for the damage done. This damage may have been much less than what would have occurred otherwise, and, if so, the responsibility should be willingly accepted by the tug, which was saved from the apparently much greater loss.

The libelant may have a decree.