## THE GERRY.

### (District Court, D. Maryland. March 17, 1908.)

1. COLLISION—STEAM VESSELS MEETING—OBSERVANCE OF RULES.

A vessel which undertakes in a narrow channel to pass on the starboard side of a meeting vessel, in violation of the rule, if she receives no assenting response to her signal, is bound to stop and reverse until the course of the other vessel has been ascertained, and she takes the risk of her signals not being heard and of her not having heard the signals of the other vessel.

2. SAME—COLLISION IN BREWERTON CHANNEL—VIOLATION OF RULES.

The steamship Barnstable and the tug Gerry met and came into collision at night in the Brewerton channel of the Patapsco river; the tug being sunk. The vessels approached each other head on, and the channel was 600 feet wide. The preponderance of evidence showed that, when from one-fourth to one-third of a mile apart the tug gave a signal of one whistle and ported her helm. Receiving a signal of two whistles from the steamship, she repeated her own signal and reversed. It was admitted by the steamship that she gave the two-whistle signal and starboarded her helm, but she claimed to have heard only the last signal from the tug. *Held*, that she was in fault, in any event, for violating the narrow-channel and head-on meeting rules for passing to the right without any sufficient excuse, and for not reversing when she did not receive an answer to her signal; and that the tug was not in fault.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 187–192.]

In Admiralty. Suit for collision.

Foster & Foster, Robert H. Smith, Jacob France, William Colton, and Beverly W. & George T. Mister, for libelants.

George Whitelock, for respondent.

MORRIS, District Judge. This litigation grows out of a collision in the Brewerton channel of the Patapsco river, off Steelton, about 11 o'clock at night, on August 25, 1907, between the steamtug Gerry and the steamship Barnstable, as the result of which the steamtug Gerry was so injured that she sank immediately, and five persons of those on board of her were drowned. The Gerry was a seagoing steamtug of 133 tons net register, drawing about 12 feet, chartered by the Standard Dredging Company, and used in connection with the dredges engaged in the deepening of the channels of the Patapsco river. The collision happened on Sunday night while the tug was proceeding from Baltimore to the dredge Standard, which was lying in the cut-off channel near Seven Foot Knoll, and had on board her crew of fifteen men, nine dredge operators, two United States government inspectors, and some supplies for the dredge. The men employed on the dredge Standard had come up to Baltimore on Saturday and were returning to begin work again at midnight, Sunday, as was customary. The tug made a short stop at Ft. Carroll to enable Government Inspector King to get the exact state of the tide, and then proceeded.

The case stated in the libel for the steamtug Gerry, which was filed two days after the collision, is that the night was clear, with bright moonlight, smooth water, and a light breeze from the westward; that, after leaving Ft. Carroll, she was proceeding down Brewerton channel, when the pilot in charge discovered directly ahead the red and

green and masthead lights of an approaching steamer a considerable distance off, and, at the proper distance, the tug blew a passing signal of one blast, and the helm was ordered ported; that, after a distinct interval, the approaching steamship blew two blasts, upon hearing which the pilot of the tug immediately ordered her engine reversed full speed astern, and ordered the helm hard aport, and again blew a signal of one blast to indicate her intention of passing port to port; that the steamship continued to approach at a high rate of speed, and, disregarding the tug's whistle, again blew two blasts, all the time her bow swinging to port across the channel, shutting in her red light and showing only her green light to those on the tug; that, although the tug's headway had been stopped, the steamship crushed into the tug just forward of the pilot house, doing such damage that the tug sank immediately, and five of the persons who were on her were drowned; and that the place of collision was about the middle of the Brewerton channel, and there was ample depth of water, not only in the channel, but outside of it, in which the steamship could have safely passed the tug.

On behalf of the steamship Barnstable, the case stated in the pleadings is that the steamship was a fruit steamer of 745 tons net register, 230 feet in length, 32 feet beam and 17 feet draft, on a voyage from Jamaica to Baltimore with a cargo of fruit, and carrying several passengers; that the navigation of the steamship was in charge of a licensed Chesapeake Bay pilot, who, with the master and first officer, were on the bridge, with a competent quartermaster at the wheel; that the steamship was proceeding up the Brewerton channel, steering by the range lights N. W. by W. ¾ W., the proper course of the channel; that there was a dredging machine, called the "Mascot," anchored in the middle of the channel, and, when about one-eighth of a mile from the dredge, the steamship stopped her engines in order to slowly pass the dredge; that, shortly before giving the order to stop her engines, those on the steamship sighted a steamtug about a point off the starboard bow showing both her red and green lights; that the steamship immediately blew two whistles to indicate that she would direct her course to port and permit the tug to pass on her starboard side; that, owing to the channel being only about 600 feet wide and the position of the dredge Mascot, which by the lights she displayed required the steamship to pass her on the north side of the channel, it was not possible for the Barnstable to pass the tug port to port, and the wheel of the steamship was starboarded, and her head went off to port; that the tug did not reply to the two blasts, but, immediately after said two blasts, the tugboat changed her course so as to shut in her red light and show her green light, indicating that the tug was passing to starboard in accordance with the two signals of the steamship; that the two vessels kept their respective courses until within 200 feet of each other, when the tug blew one whistle and suddenly changed her course and showed a red light; that immediately those on the steamship ordered her engines full speed astern and blew danger whistles; and that the vessels were so close that almost immediately thereafter they came together, the stem of the steamship striking the tug on the port side and injuring her so that she sank soon afterwards.

The Brewerton channel is 600 feet wide, of the depth of 35 feet, and at the edges is not less than 17 feet in depth, gradually shoaling beyond.

From the case stated in the pleadings, it is obvious that the steamship has the burden of justifying her conduct by clear proof showing that it was not safe and practicable for her to obey the statutory rule (article 25), which requires that:

"In narrow channels, every steam vessel shall, when it is safe and practicable, keep to that side of the far way or mid-channel which lies on the starboard side of said vessel."

It is in narrow channels, such as the Brewerton channel, that there is most risk of collision, and obedience to this rule is essential to safety. Also, by article 18, rule 1, it is required that:

"When steam vessels are approaching each other head and head, end on or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give as a signal of intention one short and distinct blast of her whistle which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head either vessel shall immediately give two short blasts of her whistle which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

The foregoing only applies to cases "in which by night each vessel is in such position as to see both the side lights of the other."

"Rule 11. If, when steam vessels are approaching each other either vessel fails to understand the course or intention of the other from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

Taking the statements in the steamship's pleadings to be exact, it appears that her pilot came to the conclusion that he could not safely keep to the north side of the channel, which was on his starboard side, for fear of touching the bottom, and that he gave two blasts, and, without getting an answer, steered across the channel intending to pass the tug starboard to starboard, instead of port to port. There is, however, direct conflict in the testimony as to the facts which were relied upon by the steamship to justify this course.

First, as to the signals. On behalf of the steamship, it is claimed that she blew the first signal, and that the tug did not blow any signal until the vessels were only 200 feet apart.

For the reason that the tug was carrying the men employed on the dredge Standard back to their work, there was on board her an unusual number of persons not engaged in her navigation, and who have been called as witnesses.

King, the United States inspector from the dredge Standard, testified that he heard the tug blow one long blast, and then heard two whistles from the steamship, and then another long blast from the tug, and then engine room signals to stop and reverse.

Simpson, blacksmith of the Standard, sitting on the pilot house steps of the tug, states that he saw the steamship right ahead, showing both side lights, and, when she was from one-fourth to one-third of a mile off, the tug blew one whistle and he heard the tug's pilot say to the

wheelman, "Port your helm"; that the steamship answered with two whistles, still showing both side lights; that, in about a minute, the tug again blew one whistle, and the tug's pilot ordered the helm hard aport and gave the engine room signals to reverse full speed astern.

Sutton, operator of the dredge Standard, who was standing at the engine room door on the tug, heard the tug blow one whistle, then the steamship blow two whistles, and then the tug blow one, and then heard the engine room signal to reverse.

Of those employed on the tug, Bergman, the wheelman, testified that, when the steamship was about 1,000 feet off, right ahead, showing both side lights, Capt. Boyd, the pilot, blew one whistle, and said, "Port your helm," which was done; that the steamship blew two whistles, and then the tug again blew one whistle, and the pilot gave him the order, hard aport, and rang signal to the engine room to reverse.

The tug's pilot, Capt. Boyd, was drowned. Murray, chief engineer of the tug, testified that he heard the tug blow one whistle, and then heard two from the steamship, and then he reversed the engines full speed astern.

Capt. McCoy, master of the tug, who was sitting on the port side, outside the pilot house, testified that he heard the tug blow one whistle, and then the steamship blow two whistles. Then he heard the engine room signals to reverse, and heard the tug again blow one whistle.

There was a dredge, called the "Mascot," anchored on the southern-most side of the channel, about abreast of which and about 200 feet off from which the collision took place, and an important witness was Nelson, a deck hand employed on that dredge, who was standing on its easternmost end, on the side next to the channel, where he could see both vessels as they approached. He testified that the tug blew one whistle, and then the steamship replied with two whistles, and then the tug again blew one whistle, and then the steamship blew short blasts, and that soon after the tug blew one whistle the second time he heard her engine signals to reverse.

On behalf of the steamship, on the question of the signals, the licensed pilot in charge, J. H. Hebb, testified that he blew two whistles when he was about a quarter of a mile from the tug, but he heard no answer from the tug for two or three minutes, and not until he was about 100 to 200 feet off; that he then reversed full speed astern and blew danger whistles; that the one blast he heard from the tug was almost at the same moment with the collision, not over one or two seconds between; and that he heard no other signal from the tug.

Burton Davison, first officer of the steamship, testified that he saw both side lights of the tug from one-fourth to one-half of a mile off, and blew two whistles, but heard no whistle from the tug until she was 100 to 150 feet off on his port bow, when she blew one whistle; that it was about three minutes between the steamship's signal of two whistles and the tug's one whistle.

The testimony of Hermanson, the quartermaster, is to the same effect as to the signals, and he also states that when the pilot blew two whistles he gave the order to starboard, and the wheel was put starboard, and he got no order to change up to just before the collision, when the order was hard astarboard. Bosse, the lookout on the

steamship, testified to the same effect as to the signals. Wilmer Davison, master of the steamship, testified to the same effect as to the signals.

It thus appears that all those from on board the tug who survived and were in a position to hear, and also the man on the dredge Mascot, testify that the tug blew a signal of one whistle when from a quarter to a third of a mile away, and those engaged in the navigation of the steamship testify that the first whistle was given just before the collision, and when she was only distant from 100 to 200 feet. To my mind, the testimony on behalf of the tug preponderates in probative force. It is also aided by the rule that the witnesses who testify as to what occurred on their own ship are to be preferred to those who contradict them from their observations made on the approaching vessel. It is also fortified by the fact that the course of the tug was in fact directed in accordance with the signals she claims to have given, and not in obedience to the signals claimed to have been given earlier on the steamship. The steamship, by her own showing, was violating the rules both in directing her course to port and in taking the south side of the channel before she had an agreement with the tug by an interchange of signals.

Moreover, I think it appears from the testimony that the pilot on the steamship was mistaken in several particulars with regard to the situation. He supposed the dredge Mascot, which he had to pass on her north side, was lying in the middle of the channel, and that there was only 200 feet between her and the northern edge; whereas, it is established, as I find, that the Mascot had been moved over, on Saturday night, to the southward, outside the third cut of the channel, and was 420 feet away from its northern edge, the total width of the channel being 600 feet. Although he saw both side lights of the tug, and, as her witnesses testify, those on the tug saw both side lights of the steamship, the pilot thought the tug was to the northward of the channel and intended passing the steamship by continuing outside of the channel on the north side and on her starboard. This was an erroneous assumption which the pilot endeavored to make good by blowing two whistles and forcing the tug to take that course. If the tug was as far to the northward of the channel as those on the steamship took her to be, they could not have seen both her side lights. That the pilot's intention was to force the tug to pass to starboard and on the north side of the channel is made evident by his having, when he was one-fourth of a mile from the tug, given the order to his quartermaster to starboard the wheel and pass the Mascot as close as possible.

The witnesses from the steamship testify that, after they blew the two-whistle signal, they observed that the lights of the tug changed, and she shut in her red light and showed only her green, from which they concluded that she assented to their signal and was shaping her course to the northward under a starboard helm. But in the face of the convincing testimony that the tug did not so change her course, I think it must have been that the change of course of the steamship under a starboard helm brought her where she could only see the tug's green light until the hard aport helm of the tug brought her red light into view again.

161 F.—27

As to the probabilities as to which of the two pilots was most likely to fail of giving attention to the other vessel, we have, on the one hand, the pilot of the tug accustomed daily to use the channel and very familiar with the location of the dredge, engaged in navigating a vessel of moderate draft, with nothing to divert his attention; on the other hand, we have the pilot of the steamship devoting his attention to getting the steamship past the dredge in what he took to be a narrow space of 200 feet.

The absence of the tug's pilot is, of course, the absence of an important witness; but as the steamship by the violation of a rule brought about the risk of collision, the fact that as a result of the collision the tug's pilot was drowned overcomes any presumption that might be drawn from his absence.

I find that the steamship was in fault. She had no right, under the circumstances, to assume, until she got an assenting answer to her two blast signals, that the tug was going to proceed contrary to the rule and pass her starboard to starboard and on the wrong side of the channel.

I had occasion to speak of the strict adherence to the rules of navigation required of vessels passing each other in the channels of the Patapsco river in the case of The Acilia and The Crathorne, reported in 108 Fed. 975 (affirmed 120 Fed. 455, 56 C. C. A. 605), and to cite the authorities. Among other cases of collisions in the same channels caused by want of adherence to the same rules may be mentioned: The Frostburg (D. C.) 25 Fed. 451, The Virginia and The Louise (D. C.) 49 Fed. 84, and the same case on appeal, 52 Fed. 885, 3 C. C. A. 330.

It is next to be considered whether the tug is shown to have committed any fault or disregarded any rule which contributed to the disaster.

The testimony on her behalf establishes that the steamship's signal of two blasts was not heard until quite an interval after the tug's signal of one blast, and that the tug at once repeated her one blast and immediately reversed her engines full speed astern, and was at a standstill when the collision occurred. On board the steamship, when they heard the tug's second signal of one blast (which was the first they heard), the pilot of the steamship at once ordered her engines full speed astern, but the vessels were then only from 100 to 200 feet apart, and it was too late. The tug had a right to be cautious in coming to the conclusion that the steamship intended to violate the rule and take the wrong side of the channel. Up to the time when they received the two-blast signal, they had a right to suppose the steamship meant to obey the rule. When they received notice by the two blasts that she did not intend to obey the rule, they immediately reversed full speed astern. This she was bound to do, and it was all she could do. The New York, 175 U. S. 187–201, 20 Sup. Ct. 67, 44 L. Ed. 126.

The vessel which undertakes to proceed contrary to the rule, without an assenting signal from the approaching vessel, takes the risk of her signals not being heard and of her not having heard the signals of the other vessel. Not having heard the first signal of two blasts

which those on the steamship claim to have given, those on the tug had reason to suppose that at least as soon as the steamship was clear of the dredge Mascot she would go to the starboard, and that the pilot of the steamship had concluded that with her speed she could do it, knowing, as the pilot of the tug did from his familiarity with the location of the dredge, that there was plenty of room for the steamship to pass in the channel to the northward of the dredge.

The learned opinion of the Chief Justice in the leading case of The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, settles many points which can be well applied to the present case. The rule is also sanctioned that, where one vessel has caused a collision by disregarding a statutory rule which the other vessel had a right to rely upon being obeyed, the proof of fault on the part of that other vessel should be clear and convincing to justify the court in holding her also in fault, and doubts about her management should be resolved in her favor.

The attempt of the steamship to take the wrong side of channel is sought to be justified by the risk she would have run of touching bottom if she had not directed her course as close as she could to the dredge. But the real distance was 420 feet between the dredge and the northern side of the channel, which was ample for both the steamship and the tug to have passed in safety, and, if the pilot of the steamship did not think so, he could have stopped the steamship before she was abreast of the dredge until the tug had passed, or until he had an assenting signal from the tug showing that she understood that the steamship purposed to pass starboard to starboard, and the tug assented to it. It is well settled that when a vessel which has signaled by two blasts that she intends passing to starboard, instead of to port, and gets no assenting response, it is her duty to stop, reverse, and, if necessary, come to a standstill, until the course of the other vessel has been ascertained with certainty and the risk of collision removed. The New York, 175 U. S. 189–201, 20 Sup. Ct. 67, 44 L. Ed. 126.

I do not find any sufficiently clear proof of any fault committed by the tug.