216 F.2d 84
 DET FORENEDE DAMPSKIBS-SELSKAB, a/s, as owner of the
Motorship Colombia, and as bailee of her cargo,
Libelant-Appellee,
v.
Steamship EXCALIBUR, her engines, boilers, etc., and against
American Export Lines, Inc., owner and operator of
said steamship, Respondent-Appellant.
In the Matter of the Petition of DET FORENEDE
DAMPSKIBS-SELSKAB A/S, for exoneration from or limitation of
liability, Petitioner-Appellee, American Export Lines, Inc.,
Federal Insurance Company, et al., United States of America
and Robert I. Dussell, Claimants-Appellants.
 No. 267, Docket 23062.
 United States Court of Appeals, Second Circuit.
 Argued June 15, 1954.
Decided Sept. 21, 1954.
 
 Bigham, Englar, Jones & Houston, New York City, Proctors for Claimants-Appellants, Federal Insurance Company, et al.; Richard F. Shaw, New York City, of counsel.
 Kirlin, Campbell & Keating, New York City, Proctors for Appellee; Harold B. Finn and Elmer C. Maddy, advocates.
 Before SWAN, MEDINA and HARLAN, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 The collision occurred on an ebb tide of two knots, June 27, 1950, in the early afternoon of a clear day, under ideal weather conditions, and without the presence of interfering traffic, on the easterly side of the Main Ship Channel leading from the Narrows to New York Harbor, a short distance northwest of the Bay Ridge Channel Junction Buoy.
 
 
 2
 The Colombia, a cargo vessel carrying a few passengers was inbound from Philadelphia, and the Excalibur, a combination passenger and cargo vessel, with 114 passengers aboard, was leaving for Mediterranean ports. Each was a large vessel, the Colombia about 416 feet long, of 5146 gross tons and the Excalibur 452, with a gross tonnage of 9644. As they sighted one another at a distance of three miles each was on the starboard side of the channel proceeding at full speed or an aggregate of 24 nautical miles an hour over the ground.
 
 
 3
 The version of the sequence of events as given by those on board the Excalibur is so fantastic and in such conflict with the probabilities and established facts that we shall pass it over. The real question is whether the Colombia also was at fault.
 
 
 4
 The preliminary movements of the two vessels are pretty well established. At all times the Colombia was on the easterly side of the channel where she belonged. But the Excalibur, when she reached a point abeam of Robbins Reef, swung to port and crossed over to the Brooklyn side of the channel so that her captain might wave to his wife as he went by. As the Narrow Channel Rule, Article 25, Inland Rules, 33 U.S.C.A. § 210, was applicable to this main and often crowded artery of traffic in and out of New York Harbor, the Excalibur should have held to starboard as the usual course was unquestionably safe and practicable. This was a statutory fault, as held by the trial judge, and it remains such even though the course to port, under such circumstances as here obtained, might seemingly be carried out in safety. One who deviates from the rules must take, at least to some extent, the risk of subsequent events.
 
 
 5
 Having changed her course the Excalibur sounded two blasts for a starboard to starboard passing and the Colombia responded. As she was diesel powered, the usual white feather of steam did not appear at her funnel head, but the responsive two blasts were nonetheless given. As the windows on the deckhouse of the Excalibur were closed, the signals from the Colombia were not heard. Accordingly, in compliance with Article 18, Rule III, 33 U.S.C.A. § 203, the Excalibur should have immediately sounded the danger signal of not less than four short and rapid blasts; but she did not. This was a serious delinquency at a critical moment and set the stage for what followed.
 
 
 6
 The Colombia in response to the agreement on a starboard to starboard passing changed her course to port. As the Colombia responded to this change of course the vessels continued at full speed ahead and were in close proximity of one another, with every prospect of a safe starboard to starboard passing.
 
 
 7
 Then came the final and disastrous step in the series of errors committed by the Excalibur. Probably because of the confusion resulting from what those in the wheelhouse of the Excalibur must have considered a failure of the Colombia to respond to the two blast call for a starboard to starboard passing, all of which might readily have been dispelled by a compliance with Article 18, Rule III, and in some measure due also to inattention or faulty observation, the Excalibur decided to get back on the starboard side of the channel, or at least to mid channel, and sounded one blast, calling for a complete reversal of the course previously agreed upon. Not only this, but, even before giving this signal, she already had changed her course to starboard. This was established by the testimony of several witnesses. Thus, on a set of facts scarcely open to any serious dispute, we find the two vessels turning in the same direction, with the Excalibur headed for a position immediately in the path of the Colombia; neither had settled on a course straight ahead.
 
 
 8
 Aside from speculations and expressions of mental operations concerning what might or might not have happened, and the reasons for doing this or that, we now enter the area of serious controversy. The distance between the two vessels when the Excalibur switched her signals is in dispute. We think the evidence amply supports the finding of the trial judge that the single blast was sounded when only a half a mile separated the two ships. At the speed with which they were approaching one another this distance would be traversed in something like seventy-five seconds. The trial judge found that this final change of course and the giving of the one blast call for a port to port passing placed the vessels 'almost in extremis.' We find that there was no 'almost' about it; the vessels then were in extremis.
 
 
 9
 The principal contentions of the Excalibur are based upon what the Colombia did in the brief interval of time just prior to the collision. The pilot of the Colombia who had observed the Excalibur swinging to starboard before the change of signals, responded with one blast from his whistle, ordered the wheel hard astarboard, rang the engines full speed astern, gave the danger signal, followed by three blasts, the regulation backing signal. These actions followed one another in rapid sequence. They were all part of a single effort to avoid a collision, in the vain hope that the vessels might slide by one another, port to port. The claim that the giving of the single blast was a fault under these circumstances is completely unwarranted. The pilot testified that he did not see what else he could do; and we agree with him.
 
 
 10
 As said by Judge Learned Hand in City of New York v. American Export Lines, 2 Cir., 1942, 131 F.2d 902, 905: '* * * it was in no sense an 'acceptance' of the 'Coney Island's' proposal; it was forced upon her willy-nilly by conduct which as we shall show was utterly unjustified.'
 
 
 11
 Just as the Excalibur sounded the single blast above referred to the master of the Colombia was coming through the chart room, immediately aft of the wheelhouse. He saw that the Colombia was still swinging to port as the change of helm and the reversing of her engines had necessarily done no more than reduce the effect of the port helm previously in force; he could see that a collision was imminent as the Excalibur was then across his bow; he observed where the engine room and the passenger quarters of the Excalibur were located; and he ordered the second officer up to man the anchor and directed the quartermaster to hard aport. This probably averted a major disaster as the bow of the Colombia, a few seconds later, struck the Excalibur just forward of the passenger quarters. Incidentally, some notion of the confusion aboard the Excalibur may be derived from the undisputed fact that at the time of the collision the Excalibur was still proceeding at full speed and the vessels came together at an angle of seventy degrees.
 
 
 12
 Whenever a master takes charge while a pilot is at his task, the claim is made that he is at fault in doing so; but it is safe to say that seldom if ever was the claim so lacking in substance as it is here. We agree with the trial judge who found that what the master did was not only not a fault but rather the act 'of a careful and intelligent master' in the performance of his duty. But, had it been otherwise, a mere error of judgment in such an emergency would have been of no avail to the Excalibur.
 
 
 13
 Finally, in an endeavor to cast some doubt upon the master's testimony, which was credited by the trial judge, appellants say that the time interval and hence the distance between the two vessels was greater, because it was physically impossible for the second officer to make his way up to the bow in so short a time. But a man moves fast when his ship is about to hit another vessel amidships and this was but one of the many attendant circumstances which in the aggregate it was the duty of the trial court to consider.
 
 
 14
 We are satisfied that he disregarded none of the proofs adduced before him and that the record presents no substantial error.
 
 
 15
 Affirmed.