**MOORE–McCORMACK LINES, INC.,**
Libellant,

v.

**S.S. PORTMAR, her engines, etc., and Calmar Steamship Corporation,**
Respondent.

**CALMAR STEAMSHIP CORPORATION,**
as owner and operator of the S.S. Portmar, Cross-Libellant,

v.

**S.S. MORMACGUIDE, her engines, etc.,**
and
Moore-McCormack Lines, Inc., as owner of the S.S. Mormacguide, Cross-Respondent.

United States District Court
S. D. New York.
Jan. 12, 1966.

Burlingham, Underwood, Barron, Wright & White, New York City, for Moore-McCormack Lines, Inc., Eugene Underwood, and Kenneth Volk, New York City, of counsel.

Mendes & Mount, New York City, for Calmar Steamship Corp., Alfred A. Lohne, and Brendan J. Connolly, New York City, of counsel.

BONSAL, District Judge.

These consolidated libels in admiralty [1] were brought as a result of the collision of the S.S. MORMACGUIDE and the S.S. PORTMAR, which occurred in the East River in the late evening of January 24, 1961. The starboard buff of the bow of the PORTMAR came into contact with the starboard side of the MORMAC-GUIDE about midships, causing damage to both vessels, which is the subject matter of the libels here involved. The collision took place on a clear, cold evening with unlimited visibility at approximately the middle of the eastern half of the channel in the East River between the Bronx shore and North Brother Island.[2] The libels were tried in admiralty, October 4–7, 1965.

As to be expected when two ships collide on a clear night with unlimited visibility, the stories of the respective vessels are in sharp conflict. But, for the reasons hereinafter stated, the court finds that the collision was caused by the negligence of both vessels and that, accordingly, the damage must be borne equally by the libellants. The Catharine v. Dickinson, 58 U.S. 170, 17 How. 170, 15 L.Ed. 233 (1854).

### The Collision

The MORMACGUIDE,[3] owned and operated by Moore-McCormack Lines, Inc., was proceeding from New Haven, Connecticut, bound for Camden, New Jersey. At the times here involved, her navigation was in charge of her master

1. On April 10, 1961, Moore-McCormack Lines, Inc. filed a libel against the S.S. PORTMAR, her engines, tackle, etc., and on May 12, 1961 amended its libel to include Calmar Steamship Corp. as owner pro hac vice and operator of the PORT-MAR. On August 16, 1961, Calmar Steamship Corp. filed a libel against the S.S. MORMACGUIDE, her engines, tackle, etc. and against Moore-McCormack Lines, Inc. as owner of the MORMAC-GUIDE. These actions were consolidated for trial on July 3, 1963.

2. Following the trial, the parties stipulated the position of the collision as being within the circle marked on the chart attached to the stipulation dated October 21, 1965, indicating that it occurred between the Consolidated Edison Plant and Port Morris (both on the Bronx shore).

3. The MORMACGUIDE is a vessel of 7,958 gross tons, 468.5 ft. long, 69.6 ft. beam, and 29.5 ft. deep. At the time of the collision she was partially loaded and her draft was 10 ft. forward and 19 ft. aft.

and the coast pilot, and with them on the bridge were the third mate and an able seaman, who was at the wheel. A lookout was stationed at the bow. The MORMACGUIDE had passed Barretto Point and was proceeding down the middle of the channel. As she approached the green light on the north end of North Brother Island at 23:19 p. m., she reduced her speed from full throttle to half ahead and commenced a port swing around the island. At 23:20 she observed the tug CELTIC (with a tow on her starboard side) proceeding northward in the eastern half of the channel and exchanged one-blast signals with the tug to indicate a port-to-port passing.

Immediately following this exchange of signals with the CELTIC, Captain Drobish of the MORMACGUIDE observed the green light of a vessel (which later proved to be the PORTMAR) proceeding northward "near the Bronx shore" off Stony Point.[4] Drobish reported to the pilot, Hildreth, who blew a two-blast signal to indicate a starboard-to-starboard passing. No reply was heard from the PORTMAR, and approximately 30 seconds after the first two-blast, a second two-blast signal was blown.[5] Again no reply was heard.

By this time, approximately two minutes before collision, the MORMACGUIDE had completed her port swing around North Brother and was passing the CELTIC. The MORMACGUIDE

was on a steady course proceeding west of south down the East River. She was still in midchannel and could see only the green starboard light of the PORTMAR. Assuming that the vessels would pass starboard-to-starboard, the MORMACGUIDE again altered her course to the port at 23:21.25.

The PORTMAR,[6] in the meantime, was proceeding east of north up the channel and was slightly west of midchannel. Her navigation was in charge of the master and a coast pilot, and on the bridge with them were the third officer and a man at the wheel. A lookout and the first mate were stationed at the bow. As the PORTMAR passed Lawrence Point at 23:20,[7] she observed the CELTIC and tow proceeding northward along North Brother Island and the tanker TERNOY discharging oil at Port Morris. Because of these observations, the PORTMAR reduced her speed at 23:21 from full speed to half ahead and blew a two-blast signal to the CELTIC requesting permission to overtake her on the tug's port side. No reply to this signal was heard.

It appears that at 23:21 the PORTMAR had not yet observed the MORMACGUIDE nor had she heard the first two starboard-to-starboard passing signals from the MORMACGUIDE. It was not until after 23:21.5 that she sighted the MORMACGUIDE, which was then showing both her red and green side lights.[8] Just before 23:22 the PORT-

4. There was testimony that due to the confusion of lights emanating from the Consolidated Edison Plant on Stony Point, those aboard the MORMACGUIDE could not determine the exact position of the PORTMAR. The weight of the evidence places the PORTMAR slightly to the west of midchannel.

5. Although neither of these signals was heard by those aboard the PORTMAR, Captain Dempsey of the CELTIC, a disinterested witness, testified that they were in fact given.

6. The PORTMAR is a vessel of 7,133 gross tons, 423.1 ft. long, 57.1 ft. beam, 34.8 ft. deep. She was under bare boat charter to Calmar Steamship Corp. and was partially loaded with a cargo of lumber and pulp.

7. There was a two minute time difference between the PORTMAR's clock and the bridge clock aboard the MORMACGUIDE. To avoid confusion, all times given are those of the MORMACGUIDE.

8. The true course of the channel southbound is 218° and the MORMACGUIDE did not reach a heading of 218° until 23:21.6. Therefore, at 23:21.5 those aboard the PORTMAR could observe both the red and green side lights of the MORMACGUIDE. This finding accepts Mr. Suarez's postulated 1¼ minute time difference between the MORMACGUIDE's course recorder clock and her bridge clock. However, the court does not accept Mr. Suarez's testimony as to the track of the MORMACGUIDE, because he assumed a starting point which the court does not find to be supported by the evidence.

MAR blew a one-blast signal to the MORMACGUIDE proposing a port-to-port passing [9] and simultaneously put her helm hard right for the purpose of making such a passing. Since the MORMACGUIDE had begun her second port swing almost a minute earlier, collision became inevitable.

The MORMACGUIDE did not hear the PORTMAR's one-blast, but observing the latter's swing to starboard, gave a third two-blast signal (a minute before the collision). The PORTMAR heard this signal and responded with her danger signal and put her engines full astern, and signalled the MORMACGUIDE that she had done so. The MORMACGUIDE put her engines full ahead and her helm hard right in an attempt to swing her stern clear of the PORTMAR. The collision followed at 23:23, when the PORTMAR struck the MORMACGUIDE amidships at a 45° angle.

### The MORMACGUIDE

It is undisputed that the Narrow Channel Rule (Art. 25 of the Inland Rules, 33 U.S.C. § 210) applies to the waters in which the collision occurred. See The Lexington (Transfer No. 15), 79 F.2d 252 (2d Cir.1935). The Narrow Channel Rule provides as follows:

"Art. 25 [33 U.S.Code 210.]

In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

Article 18 of the Inland Rules with respect to the passing of vessels (33 U.S.C. § 203) is also applicable to these waters:

"Art. 18 [33 U.S.Code 203.]

Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

In proposing a starboard-to-starboard passing with the PORTMAR, the MORMACGUIDE decided on a course which would and did necessitate that she enter her port hand waters. She made this decision despite the presumption under the Narrow Channel Rule that it is "safe and practicable" to keep to the starboard hand side of midchannel. The Gerry, 161 F. 413 (4th Cir.1908); The Benj. Franklin, 145 F. 13 (2d Cir.1906). At trial, the MORMACGUIDE failed to overcome this presumption. The Narrow Channel Rule requires vessels to keep to the right unless the circumstances are such that safety and practicability dictate a passage to the left.[10]

9. This signal was not heard by those aboard the MORMACGUIDE, but statements by those in charge of the PORTMAR that it was given is supported by the testimony of disinterested witness Lawrence.

10. The Narrow Channel Rule requires vessels, like automobiles, to keep to the right unless the circumstances are such that safety and practicability dictate a passage to the left. The importance of the Narrow Channel Rule to southbound vessels proceeding west of the Brother Islands was demonstrated by the testimony of Captain Dempsey of the CELTIC. He testified that as he was proceeding north with his tow, he observed a small tanker and a tow with a barge proceeding west in the channel between North Brother Island and South Brother Island, and that, because of this, he continued northward along the west side of North Brother instead of using the channel between the islands. It follows from his testimony that a southbound vessel proceeding on

██ It appears that the MORMAC-GUIDE, perhaps because of the confusion of lights on the Bronx shore, was uncertain of the PORTMAR's exact position when she first observed her. The MORMACGUIDE assumed that the PORTMAR was "near the Bronx shore" and accordingly reached the unwarranted conclusion that it was safe and practicable to disregard the Narrow Channel Rule. But from the evidence the court finds that the PORTMAR was only slightly to her port of the center of the channel. Had the MORMACGUIDE continued down the middle of the channel until she could definitely ascertain the position of the PORTMAR, she would have found it "safe and practicable" to alter her course to starboard.[11] Indeed, if at that time the MORMACGUIDE had so altered her course in compliance with the Narrow Channel Rule, the vessels would have reached positions where they were "head and head" which, under Article 18, would have called for an exchange of one-blast signals and a port-to-port passing. Under the Narrow Channel Rule, the MORMACGUIDE was entitled to presume that the PORTMAR would alter her course to starboard (The Victory & The Plymothian, 168 U.S. 410, 425, 18 S.Ct. 149, 42 L.Ed. 519 (1897)) and when the PORTMAR in fact did so, the result would have been a port-to-port passing instead of a collision. Taking all these factors into consideration, the court finds from the evidence that the MORMACGUIDE has failed to overcome the presumption under the Narrow Channel Rule that keeping to the waters on her starboard was safe and practicable.[12]

 In addition to being at fault in adopting a course which would necessitate her entering her port hand waters in violation of the Narrow Channel Rule, the MORMACGUIDE was at fault in persisting to navigate for a starboard-to-starboard passing without the assent of the PORTMAR. It appears from the evidence that two minutes before the collision the MORMACGUIDE was in midchannel and the PORTMAR only slightly to her port side. It is true that where vessels are so far to the starboard of each other as not to be considered meeting head and head, agreement to a starboard-to-starboard passing is not essential. The George H. Jones, 27 F.2d 665 (2d Cir.1928); The Bellhaven, 72 F. 2d 206 (2d Cir.1934). On the other hand, where the vessels are meeting "head and head * * * or nearly so," no helm action should be taken unless to avoid im-

the port side of the channel between North Brother and the Bronx shore would have less navigating room and less time to observe vessels coming west out of the channel between the islands than would a vessel proceeding in midchannel or in its starboard waters. This factor reinforces the presumption that in these waters it was "safe and practicable" for the MORMAC-GUIDE to keep to its starboard hand waters.

11. When the MORMACGUIDE first sighted the PORTMAR, the vessels were approximately one mile apart. Although the court has not made specific findings as to the speeds of the vessels, on which there was a welter of conflicting testimony, it is likely that the vessels were approaching each other at average speeds of approximately 8 to 10 knots. Under the weather conditions prevailing, there was adequate time for the MORMAC-GUIDE to determine the exact position of the PORTMAR.

12. Since the MORMACGUIDE violated the Narrow Channel Rule, she had the burden of establishing that this violation not only did not contribute to the collision but that it could not have contributed to the collision. The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1873). From the evidence as a whole, it appears that the MORMACGUIDE's initial decision to pursue a course that would carry her into her port hand waters and to pass the PORTMAR starboard to starboard colored all her later actions. She adhered to her initial decision without regard for the consequences, and this contributed to the collision. This is not a situation where the violation of the Narrow Channel Rule was a "condition" and not a "cause" of the collision. See, The Syosset, 71 F.2d 666, 668 (2d Cir. 1934); The Socony No. 19, 29 F.2d 20, 22 (2d Cir. 1928).

mediate danger until a passing agreement has been reached. Marshall Field & Co. v. United States, 48 F.2d 763 (2d Cir.1931). For the reasons stated below, the court finds that the MORMAC-GUIDE was at fault in putting her helm to port 1¾ minutes before the collision without the PORTMAR's assent to the proposed starboard-to-starboard passing.

■ First, considering the relative positions of the vessels, some helm action was necessary to effectuate a passing. This fact alone may be sufficient to charge the MORMACGUIDE with fault for initiating a port swing without the PORTMAR's assent. See, Construction Aggregates Co. v. Long Island R.R., 105 F.2d 1009, 1012 (2d Cir.1939) (holding that "where *any* change of helm is necessary * * * the rudder shall not be moved until assent has been secured.") The vessels were slightly to the starboard of each other, but not so far to starboard that the precaution of a passing agreement could be discarded.

Other considerations make it clear that agreement to a passing was necessary under the facts of this case. For example, the vessels here involved were navigating in a curving channel. The so-called "Sinuosities Rule" (The Victory, 168 U.S. 410, at 418, 18 S.Ct. 149, 42 L. Ed. 519) provides, in part, that no agreement to a passing is necessary where the courses obviously intended are such that the vessels will pass starboard to starboard when they meet, even though because of a curving channel, their relative courses are temporarily different. The Merida, 210 F. 440 (2d Cir.1913). But the courts have recognized that the possibility of confusion is more likely in curving channels and that greater care is necessary. As stated by Judge Learned Hand in City of New York v. American

Export Lines, 131 F.2d 902 (2d Cir. 1942), at p. 906:

"We do not indeed mean that if the vessels are so close when they first see each other that the one which signals first cannot safely wait for an answer, she must do so; but when she is not pressed, she should learn whether the other vessel sees the mutual positions as she does. * * * [N]othing is more common than for one to understand it in one way and the other in the other, particularly in a case like this where there is a bend in the channel."

It appears from the evidence that the PORTMAR would have observed only the red or both the red and green lights of the MORMACGUIDE until the vessels were less than 1½ minutes from collision. The MORMACGUIDE, particularly in view of the fact that the vessels were only slightly to the starboard of each other, should have been aware of the potentialities for misunderstanding. She should not have put her helm to port before receiving acknowledgment to her starboard-to-starboard passing signals.[13]

■ Moreover, the MORMACGUIDE embarked on a course which would and did put her into her port hand waters. The left rudder order given at 23:21.25 carried her well to the port of midchannel. Under these circumstances, having violated the Narrow Channel Rule, the MORMACGUIDE had a duty to use greater care in navigation with respect to other vessels. Griffin, The American Law of Collision (1949), § 36(4), at p. 97. It has been stated that a vessel which proceeds on the wrong side of the channel "must take at least to some extent, the risk of subsequent events" (Det Forenede Dampskibs-Selskab, A/S v. The Excalibur, 216 F.2d 84, 85 (2d Cir.1954) and "takes the risk of her signals not be-

---

13. For example, had those on the PORT-MAR had the MORMACGUIDE under observation from the time the latter first stood out from North Brother Island, it would have appeared to them that the MORMACGUIDE crossed the PORT-MAR's bow twice, first on its original swing and second when she swung to port 1¾ minutes before the collision. This is the kind of confusion likely to arise in a curving channel, which points up the importance of not changing course to port (contrary to the Narrow Channel Rule) without agreement of the other vessel.

ing heard." The Gerry, 161 F. 413, 418 (4th Cir.1908). This higher duty of care required that the MORMACGUIDE secure the assent of the PORTMAR to a starboard-to-starboard passing before again altering her course to port.

Finally, by ordering her helm to port 1¾ minutes before the collision without any assent having been received from the PORTMAR, the MORMACGUIDE, as her pilot testified, became irrevocably committed to a starboard-to-starboard passing because she could not have broken her swing in time to effect a port-to-port passing. The left rudder order was given before the MORMACGUIDE was forced to act. Certainly some effort should have been made by the MORMACGUIDE such as a danger signal followed by a repetition of the starboard-to-starboard passing signal to secure the PORTMAR's assent before the MORMACGUIDE so irrevocably committed herself.

 Accordingly, the court finds that the MORMACGUIDE's initial determination to adopt a course which violated the Narrow Channel Rule and her persistence in navigating for a starboard-to-starboard passing without the assent of the PORTMAR constitute fault on her part.[14]

### The PORTMAR

 The evidence brought out that the PORTMAR was at fault in failing to maintain a proper lookout. Under the weather conditions prevailing and on the evidence, the MORMACGUIDE was visible to the PORTMAR for some three minutes prior to the collision. The presence of the MORMACGUIDE was not reported by the lookout at the bow, and indeed those on the bridge became aware of the MORMACGUIDE, at most, 1½ minutes before the collision. It may be that the temperature of 20° F. prevailing at the time explains the failure of the PORTMAR to properly observe the situation around them. It also may explain their failure to hear the first two signals from the MORMACGUIDE proposing a starboard-to-starboard passage, which were heard by Captain Dempsey of the CELTIC. But these facts alone are sufficient to constitute fault on the part of the PORTMAR. As stated by Justice Brown in The New York, 175 U.S. 187 (1899) at p. 204, 20 S.Ct. 67 at p. 73, 44 L.Ed. 126:

> "Her officers failed conspicuously to see what they ought to have seen or to hear what they ought to have heard. This, unexplained, is conclusive evidence of a defective lookout."

Also, see, The Lutcher Brown, 41 F.2d 176 (5th Cir. 1930); Brigham v. Luckenbach, 140 F. 322, 326 (1 Cir. 1905).

 The failure to maintain a proper lookout must be treated as a statutory fault imposing upon the PORTMAR the burden of establishing that such failure did not and could not have contributed to the collision. Rice v. United States, 168 F.2d 219, 220 (2d Cir. 1948); Gulf Oil Corp. v. The Socony, 162 F.2d 869, 870 (2d Cir. 1947). The PORTMAR did not sustain this burden and, indeed, no credible evidence was offered by the PORTMAR as to why she did not ob-

---

14. For the reasons stated in the opinion, it is not necessary to determine whether or not the MORMACGUIDE's failure to sound a danger signal as soon as she became uncertain of the PORTMAR's course (Article 18, Rule III) or to put her engines astern at that time would support a finding of fault. The PORTMAR veered to starboard a little more than a minute before collision. When she did so, the danger of collision was apparent and a danger signal would have given the PORTMAR little, if any, more information than did the two blasts which the MORMACGUIDE sounded. Commonwealth & Dominion Line v. United States, 20 F.2d 729, 732 (2d Cir. 1927); Bouchard Transp. Co. v. Conners Marine Co., 129 F.2d 110 (2d Cir. 1942). As to the MORMACGUIDE's failure to put her engines astern, the testimony at the trial indicated that such a maneuver under the circumstances would have increased the danger rather than lessened it. See, Construction Aggregates Co. v. Long Island R.R., 105 F.2d 1009, 1012 (2d Cir. 1939). But see, A. H. Bull S.S. Co. v. The Exanthia, 234 F.2d 650, 653 (2d Cir. 1956).

serve the MORMACGUIDE sooner, or hear her signals.[15]

The PORTMAR was also at fault in navigating slightly to the port of the center of the channel in violation of the Narrow Channel Rule. It is clear from the record that the PORTMAR's faults as aforesaid combined with the faults of the MORMACGUIDE in causing the collision.

### Conclusion

For the reasons above stated, the court finds that the faults of both vessels combined to cause the collision between the MORMACGUIDE and the PORTMAR, and therefore the damage must be borne equally by the libellants.[16] The libellants are invited to agree between themselves on a Commissioner to determine damages, and if they do, to insert his name in the decrees. If they cannot agree, the court will appoint a Commissioner.

Settle appropriate decrees in accordance with the foregoing.

15. At the time of the collision, the wind was blowing out of the northwest at 15 miles per hour. This fact should have made signals blown by the MORMAC-GUIDE more audible to those on the PORTMAR than the other way around.

16. This opinion, including the footnotes, constitutes the court's findings of fact and conclusions of law (Admiralty Rule 46½, 28 U.S.C.A.).