RED STAR TOWING & TRANSPORTA-
TION COMPANY, as owner of the
BARGE RED STAR NO. 70, Red Star
Barge Line, Inc., as owner of BARGE
RED STAR NO. 72, and College Point
Dry Dock & Supply Co., Inc., as owner
of BARGE RED STAR NO. 73, Plain-
tiffs,

v.

TUG CATHERINE, Helen B. Inc., Bronx
Towing Line, Inc., M/S PHILIPPINE
PRESIDENT OSMENA and United
Philippine Lines, Defendants. Action
#1.

NATIONAL DEVELOPMENT COMPA-
NY, as owner and United Philippine
Lines, as operator of the M/S Philippine
President Osmena, Plaintiffs,

v.

TUG CATHERINE, her engines, etc., and
Helen B. Inc., Claimant,
and
Bronx Towing Line, Inc., Defendant.
Action #2.

Nos. 65 AD. 1209, 66 AD. 618.

United States District Court
S. D. New York.

Sept. 29, 1969.

Foley & Martin, New York City, for plaintiffs, Red Star Towing & Transportation Co. and Red Star Barge Line, Inc.; Richard E. Meyer, New York City, of counsel.

Cichanowicz & Callan, New York City, for National Development Co., M/S Phillippine President Osmena, and United Phillippine Lines, defendants in Action #1 and plaintiffs in Action #2; Joseph M. Brush, Nicholas Milano, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants Tug Catherine, Helen B. Inc., and Bronx Towing Line, Inc., Louis P. Sheinbaum, New York City, of counsel.

## OPINION

BONSAL, District Judge.

These consolidated libels in admiralty[1] were brought as a result of the collision of the M/S PHILIPPINE PRESIDENT OSMENA and the barge RED STAR NO. 70, which occurred in the Kill Van Kull on the morning of October 20, 1965. The stem of the OSMENA came into contact with the starboard side of the NO. 70, about five feet back of the bow, causing damage to both vessels and to the barge RED STAR NO. 72 which was in tow behind NO. 70. The collision took place in the morning just before daybreak, with a light haze, and visibility of 2 to 3 miles, at approximately the middle of the channel in the Bergen Point East Reach. The tide was ebb, running eastward about 1½ knots. The libels were tried in admiralty, June 9, 1969.

*The Collision*

The Tug CATHERINE,[2] owned by Helen B. Inc. and operated by Bronx Towing Line, Inc., was proceeding from South Amboy eastward in the Kill Van Kull to Jersey Central Pier 18 in New York Harbor. She had three barges in tow, RED STAR NO. 73, light, made fast to the CATHERINE's port side with her bow about 10 feet ahead of the CATHERINE's bow, RED STAR NO. 72, loaded, made fast to the CATHERINE's starboard side with her bow also about 10 feet ahead of the CATHERINE's bow, and RED STAR NO. 70, loaded, in front of NO. 72 and secured

1. On December 10, 1965, Red Star Towing & Transportation Company, as owner of the barge RED STAR NO. 70, Red Star Barge Line, Inc., as owner of the barge RED STAR NO. 72, and College Point Dry Dock & Supply Co., Inc., as owner of the barge RED STAR NO. 73, filed a libel against the Tug CATHERINE, her engines, etc., Helen B. Inc., Bronx Towing Line, Inc., the M/S PHILIPPINE PRESIDENT OSMENA, her engines, etc., and United Philippine Lines; on February 16, 1968, the libel was amended to withdraw the action of College Point Dry Dock & Supply Co.,

Inc., and to add National Development Company as defendant. Thereafter, National Development Company, as owner, and United Philippine Lines, as operator of the M/S PHILIPPINE PRESIDENT OSMENA, filed a libel against Tug CATHERINE, her engines, etc., Helen B. Inc., and Bronx Towing Line, Inc. These actions were consolidated for trial on December 19, 1967.

2. The CATHERINE is a twin-screw, twin rudder, 1200 horsepower diesel tug, 79.2 ft. long, 22.0 ft. beam, with pilothouse control.

only by lines from its stern to NO. 72's bow. The flotilla was almost 300 feet long;[3] the CATHERINE was displaying port and starboard running lights, two white lights on her staff aft indicating a tow alongside, and a forward white mast light, and the barges displayed white lights on their outside corners fore and aft. At the times here involved, the CATHERINE was in charge of Captain Regis LaBrecque, and two deckhands and an engineer were on watch. At 0555, when Captain LaBrecque went to the pilothouse, the CATHERINE was just east of Shooter's Island, and was proceeding eastward at about 5 or 5½ knots over the ground, approximately 150 feet off the Staten Island side of the Kill Van Kull.

The M/S PHILIPPINE PRESIDENT OSMENA,[4] owned by National Development Company and operated by United Philippine Lines, was proceeding from Brooklyn westward in the Kill Van Kull to Port Newark. Her navigation was in charge of her master, Captain Avelino G. Zablan, and the coast pilot, Captain William H. Duncan; with them on the bridge were the third officer, junior third officer, and quartermaster. Her chief officer, Domingo B. Tolentino, Jr., was stationed at the bow as a lookout, assisted by the carpenter, boatswain and storekeeper acting as lookouts and anchor watch. At about 0608 the OSMENA entered the Kill Van Kull followed by the tug DALZELLERA stationed off her starboard quarter, proceeding with her engines at full ahead at about 10–12 knots over the ground. She had a functioning course recorder, and its clock had been synchronized with the OSMENA's bridge clock that morning.

At 0608 the OSMENA reduced her speed to slow as she entered the channel, and then increased it to half. At about 0611, when the OSMENA was in the vicinity of Platty Kill Creek, Bayonne, New Jersey, the lights of the CATHERINE were observed ahead in the vicinity of Port Richmond, Staten Island; the OSMENA gave a one-blast signal. Shortly thereafter, at about 0613, the CATHERINE opened up her green side light, indicating a turn to port, whereupon the OSMENA sounded a second single blast, and reduced her speed to slow, receiving no reply to her signal. Seeing that the CATHERINE was still proceeding to port, the OSMENA blew an alarm followed by a third single blast, to which the CATHERINE responded with an alarm followed by two whistles, indicating a starboard-to-starboard passing.

While the CATHERINE was proceeding eastward in the Kill Van Kull, entering the Bergen Point East Reach, she observed the OSMENA heading westward down the channel, showing both her red and green side lights. Fearing a collision, the CATHERINE turned to port, intending to execute a starboard-to-starboard passing with the OSMENA. After the CATHERINE gave her alarm and two-blast signal, the OSMENA put her engines full astern at about 0615, and sounded an alarm followed by three blasts indicating that she was going astern, and the CATHERINE replied with an alarm and three blasts. The CATHERINE veered across the bow of the OSMENA, and sometime before the collision at about 0616 the OSMENA dropped first her port and then her starboard anchors, at roughly the same time going to emergency full astern.

█ Shortly thereafter, at about 0617,[5] RED STAR NO. 70 collided with

---

3. RED STAR NO. 70 is a steel coal barge, 148 ft. long, 38 ft. beam; RED STAR NO. 72 is a steel coal barge, 146 ft. long, 38 ft. beam.

4. The OSMENA is a vessel of 12,176 dead weight tons, 510.2 ft. long, 62.11 ft. beam,

powered by 12,000 horsepower engines turning a single screw.

5. The exact time at which the collision occurred is not clear; there is a conflict between the OSMENA's bellbook entries, based on the bridge clock and made after

the stem of the OSMENA at a point roughly 5 feet back from the bow of NO. 70. At the moment of impact, the OSMENA was at an angle of roughly 60 degrees to NO. 70, and was either at a standstill or moving very slowly while NO. 70 was moving at about 5 knots.

The collision occurred in the Bergen Point East Reach in the vicinity and to the west of the Lehigh Valley Docks. The channel is about 1,000 feet wide, and immediately after the collision the OSMENA was situated in the starboard half of the channel nearest the New Jersey shore, with her stern roughly 150 feet from the shore and heading somewhat to port with regard to the channel.

After the collision, the CATHERINE proceeded to the Lehigh Valley Docks, dropped NO. 72 and NO. 73 there, and retrieved the NO. 70, which, having been cut loose, had drifted eastward with the current past the Lehigh Valley Docks.

*The CATHERINE*

The Narrow Channel Rule (Art. 25 of the Inland Rules, 33 U.S.C. § 210), applies to the waters in which the collision occurred. Harbor Oil Transport Co. v. The Plattsburgh Socony, 151 F.2d 708 (2d Cir. 1945). The Narrow Channel Rule provides:

"§ 210. Steam vessel in narrow channel (Art. 25)

In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The CATHERINE altered her course along the Staten Island side of the channel to make a starboard-to-starboard passing with the OSMENA, a decision which necessitated that she enter her port hand waters. She made this decision despite the presumption under the Narrow Channel Rule that it is "safe and practicable" to keep to the starboard side of mid-channel. The Benjamin Franklin, 145 F. 13 (2d Cir. 1906); The Gerry, 161 F. 413 (D.Md.1908); Moore-McCormack Lines, Inc. v. S. S. Portmar, 249 F.Supp. 464 (S.D.N.Y. 1966). At trial, the CATHERINE failed to overcome that presumption. The Narrow Channel Rule requires vessels to keep to the right unless the circumstances are such that safety and practicality dictate a passing to the left.

It appears that Captain LaBrecque of the CATHERINE, observing both the red and green lights of the OSMENA, concluded that the OSMENA was on a collision course with the CATHERINE, panicked, and altered course to make a starboard-to-starboard passing. The court finds, however, that the OSMENA was proceeding on her starboard hand

the collision, and the OSMENA's course recorder tape, and Captain LaBrecque's testimony. If the testimony of Suarez, the CATHERINE's expert witness, that the disturbance on the tape at 0615 course recorder time was caused by the shock of the collision is accepted, then the anchors were dropped and the engines reversed only at the moment of or after the collision. However, since the court accepts the testimony of Meek, the OSMENA's expert witness, with regard to the speed and angle of the OSMENA at the moment of impact, it is also satisfied that the sequence and time span of events as outlined in the bellbook are correct, whatever the precise hour of the events was.

The court is not required to accept the evidence of a course recorder tape over the other evidence of witnesses which it finds convincing, Ira S. Bushey & Sons

v. Standard Oil Co., 197 F.2d 788 (2d Cir. 1952), particularly where, as here, both the interpretation of the tape and the recorder's reliability are questionable. Suarez testified that the tape recorded two disturbances, one at course recorder time 0613.9 and one at 0615. He did not express an opinion whether the reversal of the OSMENA's engines might register as such a disturbance—if it could and did, and was the earlier of the two shocks on the tape, then Duncan's testimony is consistent with the course recorder, which was for some reason reading about 2 minutes slower than the bridge clock, notwithstanding their synchronization that morning. Suarez also testified that he had to make a correction of 0.5 degree in his readings of the tape because the pen ran off the scale at one point.

(New Jersey) side of the channel, following the ranges in the area, and never crossed the center of the channel. Under the Narrow Channel Rule, the CATHERINE was entitled to presume that the OSMENA would alter her course to starboard, The Victory & The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897), and had she done so, the result would have been a port-to-port passing instead of a collision. Had the CATHERINE continued on her original course, following the Staten Island shore, she would have had time to ascertain the OSMENA's heading and would have found it "safe and practicable" to obey the Narrow Channel Rule, as the OSMENA was proceeding on her starboard hand side of the channel. The court finds from the evidence that the CATHERINE has failed to overcome the presumption under the Narrow Channel Rule that keeping to the waters on her starboard hand was safe and practicable.[6]

The CATHERINE was also at fault in attempting a starboard-to-starboard passing without the OSMENA's assent. The Kill Van Kull is a winding channel, and

> "it is now hardly necessary to say that in a crooked channel the test whether the relative position of two vessels requires them to pass port to port or starboard to starboard, is not their relative headings when one is in one reach of the channel and the other in the other. Their duties are fixed by their positions in the channel itself—strictly by their relative headings if the channel were straight. Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F.2d 1009." City of New York v. American Export Lines, 131 F.2d 902, 905 (2d Cir. 1942).

Had each vessel maintained her initial course, they would have passed well to the port side of each other. Under such circumstances, a port-to-port passing is required. New York Central Railroad Company v. Texaco, Inc., 226 F.Supp. 140 (S.D.N.Y.1964); 33 C.F.R. § 80.13(c). There is no apparent reason why the CATHERINE might have believed that the OSMENA's course, as opposed to her heading as she negotiated the channel, was towards the Staten Island side of the channel. But if she was in doubt concerning the OSMENA's course or believed that there was danger because the OSMENA appeared to be heading too close to the Staten Island side of the channel, she should have blown a danger signal, see, e. g., Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 332 F.2d 211 (4th Cir. 1964); Esso Standard Oil Co. v. The President Garfield, 279 F.2d 540 (2d Cir. 1960), rather than proceeding to change her course without warning and not giving a signal of her intention until the collision was imminent.

The court finds that the CATHERINE's violation of the Narrow Channel Rule and her navigation for a starboard-to-starboard passing without the assent of the OSMENA constitute fault on her part.

*The OSMENA*

The evidence is clear that the OSMENA failed to keep a proper lookout. Captain Duncan did not come out of the pilothouse, the windows of which were closed, until he sighted the CATHERINE at about 0613, and Tolentino, who evidently sighted the CATHERINE earlier, failed to report it to the bridge. It is also clear, however, that the failure to keep a proper lookout was not causally related to the collision. Albatross Tanker Corporation v. S. S. Amoco Delaware and American Oil Company, 415 F.2d 692 (2d Cir.) September 17, 1969. After 0613, Captain Duncan was fully

---

6. Since the CATHERINE violated the Narrow Channel Rule, she had the burden of establishing that this violation not only did not contribute to the collision but that it could not have contributed to the collision. The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1873). It is clear from the evidence that the CATHERINE's decision to make a starboard-to-starboard passing with the OSMENA, thus entering her port hand waters, was the cause of the collision.

aware of what was going on before him with regard to the course of the CATHERINE, so that the failure of Tolentino to report, and of Captain Zablan, who remained in the pilothouse, to observe, could not have contributed to the events which followed.

Captain Duncan's failure to observe the CATHERINE prior to 0613 did not contribute and could not have contributed to causing the collision. The occasion for action did not arise until after 0613 when the CATHERINE began to move across the OSMENA's bow, at which time Captain Duncan signalled for a port-to-port passing and slowed his engines. He testified that he did not then know what the CATHERINE intended doing, but that he assumed, as he had every right to, The Victory & The Plymothian, *supra*, that she planned to continue her course on her starboard side of the channel and the they would make a port-to-port passing. Moreover, the failure of Captain Duncan to observe the CATHERINE prior to 0613 did not confuse Captain LaBrecque, for he testified that in response to his first signal of a single blast, the OSMENA responded with a single blast. The collision was caused by the CATHERINE's attempting to cross the bow of the OSMENA, to make a starboard-to-starboard passing.

The CATHERINE offered in evidence the OSMENA's course record, and her expert witness testified that it indicates that the OSMENA was swinging to port prior to the collision. This can be explained by the course of the channel, as a vessel entering Bergen Point East Reach from Constable Hook Reach would, as Captain Duncan testified, have to turn left. Although the OSMENA was tending to port to negotiate the channel, the court finds that she was still until moments before the collision heading towards the New Jersey shore or was at most straightened up and heading parallel with the channel, on her own starboard side of mid-channel. In negotiating the turn in the channel prior to the collision, the OSMENA naturally showed her green starboard light to the CATHERINE, which from her position in the other reach of the channel, also exposed her green starboard light to the OSMENA. Captain Duncan properly interpreted the situation, while Captain LaBrecque did not.

The reading of the course recorder that the OSMENA was still swinging to port at the time of impact may be explained if before the OSMENA came to a stop, the helmsman, observing that the reversal of the engines was not going to avert a collision, turned the wheel in a last effort to avert or at least reduce the seriousness of the collision, the evidence establishing that at the time, the CATHERINE and her tow were cutting across the OSMENA's bow from port to starboard at 4-5 knots an hour overground.

The Tug CATHERINE was at fault in violating the Narrow Channel Rule and in attempting a starboard-to-starboard passing without the OSMENA's assent, and her fault caused the collision. The OSMENA properly navigated on her side of the channel and her failure to maintain a proper lookout was not causally related to the collision. National Iranian Tanker Co. (Nederland), N. V. v. Tug Dalzell 2, 284 F.Supp. 451 (S.D.N.Y.1968), aff'd, 411 F.2d 759 (2d Cir. 1969).

As a result of the collision, the barges RED STAR NO. 70 and RED STAR NO. 72 sustained hull damage in the amounts of $13,582.00 and $7,964.00 respectively. Plaintiffs claimed damages for detention of barges NO. 70 and NO. 72, but failed to prove such damages at the trial. The M/S PHILIPPINE PRESIDENT OSMENA sustained hull damage in the amount of $7,197.43 and incurred survey fees of $686.17, for a total of $7,883.60, as stipulated in the pre-trial order.

The foregoing constitutes the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a).

The clerk may enter judgments (1) in favor of plaintiff Red Star Towing & Transportation Company, as owner of

the barge RED STAR NO. 70, against defendants Helen B. Inc. and Bronx Towing Line, Inc. in the amount of $13,582.00 together with interest and the costs of the action; (2) in favor of plaintiff Red Star Barge Line, Inc., as owner of the barge RED STAR NO. 72, against defendants Helen B. Inc. and Bronx Towing Line, Inc. in the amount of $7,964.00 together with interest and the costs of the action; (3) in favor of plaintiffs National Development Company, as owner, and United Philippine Lines, as operator, of the M/S PHILIPPINE PRESIDENT OSMENA, against defendants Helen B. Inc. and Bronx Towing Line, Inc. in the amount of $7,883.60 together with interest and the costs of the action; (4) in favor of defendants M/S PHILIPPINE PRESIDENT OSMENA, National Development Company and United Philippine Lines in 65 Ad. 1209 dismissing the complaint with costs.

It is so ordered.